UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and | ) |
| STATE OF INDIANA *ex. rel.* | ) |
| ASHLEY N. VINSON and | ) |
| AMANDA E. DAVIS and | ) |
| AMANDA E. DAVIS, individually | ) |
| | ) |
| Plaintiffs/Relators, | ) |
| | ) |
| v. | ) Cause No.: 3:15-cv-96 RLY-WGH |
| | ) |
| BOARD OF TRUSTEES OF THE FLAVIUS J. WITHAM | ) |
| MEMORIAL HOSPITAL, | ) |
| PUTNAM COUNTY HOSPITAL, | ) |
| GOOD SAMARITAN HOSPITAL, | ) |
| DAVIESS COUNTY HOSPITAL, | ) |
| HENRY COUNTY HOSPITAL, | ) |
| JACKSON COUNTY SCHNECK | ) |
| MEMORIAL HOSPITAL, | ) |
| HANCOCK REGIONAL HOSPITAL, | ) |
| DEARBORN COUNTY HOSPITAL, | ) |
| GRIFFIN-AMERICAN HEALTHCARE REIT III, INC., | ) |
| TRILOGY INVESTORS, LLC, | ) **Filed *In Camera* and Under Seal** |
| NORTHSTAR HEALTHCARE INCOME, INC., | ) |
| TRILOGY REHAB SERVICES, LLC, | ) |
| PARAGON REHABILITATION, INC. | ) |
| PARAGON OUTPATIENT | ) |
| REHABILITATION SERVICES, LLC, | ) |
| TRISTAR HOME CARE, LLC, | ) |
| TRILOGY HEALTH SERVICES, LLC, | ) |
| RIVER POINTE HEALTH CAMPUS, | ) |
| OWEN VALLEY HEALTH CAMPUS, | ) |
| OAKWOOD HEALTH CAMPUS, | ) |
| HOMEWOOD HEALTH CAMPUS, | ) |
| AUTUMN WOODS HEALTH CAMPUS, | ) |
| WATERFORD PLACE HEALTH CAMPUS, | ) |
| SILVER OAKS HEALTH CAMPUS, | ) |
| ST. CHARLES HEALTH CAMPUS, | ) |
| COVERED BRIDGE HEALTH CAMPUS, | ) |
| WOODMONT HEALTH CAMPUS, | ) |
| BETHANY POINTE HEALTH CAMPUS, | ) |
| TRILOGY HEALTHCARE OF CYNTHIANA, LLC d/b/a | ) |
| CEDAR RIDGE HEALTH CAMPUS, | ) |

STONEBRIDGE HEALTH CAMPUS,                          )
THORNTON TERRACE HEALTH CAMPUS,                     )
RIVEROAKS HEALTH CAMPUS,                            )
ASHFORD PLACE HEALTH CAMPUS,                        )
MILL POND HEALTH CAMPUS,                            )
ST. ANDREWS HEALTH CAMPUS,                          )
HAMPTON OAKS HEALTH CAMPUS,                         )
SPRING MILL HEALTH CAMPUS,                          )
FOREST PARK HEALTH CAMPUS,                          )
THE MAPLES AT WATERFORD CROSSING,                   )
SPRINGHURST HEALTH CAMPUS,                          )
TRILOGY HEALTHCARE OF GLENRIDGE, LLC d/b/a          )
GLEN RIDGE HEALTH CAMPUS,                           )
TRILOGY HEALTHCARE OF LOUISVILLE                    )
SOUTHWEST, LLC d/b/a                                )
PARK TERRACE HEALTH CAMPUS,                         )
MORRISON WOODS HEALTH CAMPUS,                       )
COBBLESTONE CROSSING HEALTH CAMPUS,                 )
TRILOGY HEALTHCARE OF LOGANSPORT, LLC               )
d/b/a WOODBRIDGE HEALTH CAMPUS,                     )
BRIDGEPOINTE HEALTH CAMPUS,                         )
TRILOGY HEALTHCARE OF ELKHART, LLC d/b/a            )
GREENLEAF LIVING CENTER,                            )
CREASY SPRINGS HEALTH CAMPUS,                       )
AVALON SPRINGS HEALTH CAMPUS,                       )
WHITE OAK HEALTH CAMPUS,                            )
PRAIRIE LAKES HEALTH CAMPUS,                        )
WEST RIVER HEALTH CAMPUS,                           )
RIDGEWOOD HEALTH CAMPUS,                            )
WESTPORT PLACE HEALTH CAMPUS,                       )
HEARTHSTONE HEALTH CAMPUS,                          )
ASPEN PLACE HEALTH CAMPUS,                          )
CEDAR CREEK HEALTH CAMPUS,                          )
LAKELAND REHABILITATION & HEALTHCARE,               )
SCENIC HILLS CARE CENTER,                           )
AMBER MANOR CARE CENTER,                            )
TRILOGY HEALTHCARE OPERATIONS OF                    )
SPRINGFIELD, LLC d/b/a                              )
FOREST GLEN HEALTH CAMPUS,                          )
TRILOGY HEALTHCARE OF SANDUSKY, LLC d/b/a           )
VALLEY VIEW HEALTHCARE CENTER,                      )
TRILOGY HEALTHCARE OF PUTNAM, LLC d/b/a             )
THE MEADOWS OF KALIDA HEALTH CAMPUS,                )
TRILOGY HEALTHCARE OF ALLEN, LLC d/b/a              )
RICHLAND MANOR,                                     )
TRILOGY HEALTHCARE OF HANCOCK, LLC d/b/a            )

2

THE HERITAGE,                                                    )
TRILOGY HEALTHCARE OF PUTNAM III, LLC d/b/a     )
THE MEADOWS OF LEIPSIC HEALTH CAMPUS,            )
TRILOGY HEALTHCARE OF ALLEN II, LLC d/b/a        )
SPRINGVIEW MANOR,                                          )
TRILOGY HEALTHCARE OF OTTAWA, LLC d/b/a         )
GENOA RETIREMENT VILLAGE,                             )
TRILOGY HEALTHCARE OF HAMILTON, LLC d/b/a      )
TRIPLE CREEK RETIREMENT COMMUNITY,              )
TRILOGY HEALTHCARE OF BELLEVUE, LLC d/b/a       )
THE WILLOWS AT BELLEVUE,                              )
TRILOGY HEALTHCARE OF                                   )
NORTH BALTIMORE, LLC d/b/a                            )
BRIAR HILL HEALTH CAMPUS,                             )
TRILOGY HEALTHCARE OF MONTGOMERY, LLC        )
d/b/a CYPRESS POINTE HEALTH CAMPUS,              )
TRILOGY HEALTHCARE OF GREENVILLE, LLC          )
d/b/a VILLAGE GREEN HEALTHCARE CENTER,         )
TRILOGY HEALTHCARE OF PUTNAM II, LLC d/b/a      )
THE MEADOWS OF OTTAWA,                               )
TRILOGY HEALTHCARE OF BATTLE CREEK, LLC        )
d/b/a THE OAKS AT NORTHPOINTE WOODS,           )
TRILOGY HEALTHCARE OF JACKSON, LLC d/b/a        )
RIDGECREST HEALTH CAMPUS,                           )
TRILOGY HEALTHCARE OF OAKLAND LLC d/b/a         )
WESTLAKE HEALTH CAMPUS,                             )
ST. ELIZABETH HEALTHCARE CENTER,                  )
TRILOGY HEALTHCARE OF TIPPECANOE, LLC d/b/a )
CUMBERLAND POINTE HEALTH CAMPUS,              )
ST. MARY HEALTHCARE CENTER,                         )
TRILOGY HEALTHCARE OF JEFFERSON, LLC d/b/a     )
FRANCISCAN HEALTHCARE CENTER,                    )
BLAIR RIDGE HEALTH CAMPUS,                          )
TRILOGY HEALTHCARE OF FAYETTE I, LLC d/b/a      )
THE WILLOWS AT HAMBURG,                             )
TRILOGY HEALTHCARE OF FAYETTE III, LLC d/b/a    )
THE WILLOWS AT CITATION,                             )
GLEN OAKS HEALTH CAMPUS,                           )
TRILOGY HEALTHCARE OF MORGAN, LLC d/b/a        )
HIGHLAND OAKS HEALTH CENTER,                      )
TRILOGY HEALTHCARE OF MUSKINGUM, LLC d/b/a)
THE OAKS AT NORTHPOINTE,                            )
TRILOGY HEALTHCARE OF LUCAS, LLC d/b/a          )
THE LAKES OF MONCLOVA,                              )
TRILOGY HEALTHCARE OF HURAN, LLC d/b/a         )
THE WILLOWS AT WILLARD,                             )

TRILOGY HEALTHCARE OF MUSKINGUM II, LLC     )
d/b/a THE OAKS AT BETHESDA,     )
TRILOGY HEALTHCARE OF INGHAM, LLC d/b/a     )
THE WILLOWS AT OKEMOS,     )
TRILOGY HEALTHCARE OF GENESEE, LLC d/b/a     )
THE OAKS AT WOODFIELD,     )
STONEGATE HEALTH CAMPUS,     )
TRILOGY HEALTHCARE OF CLINTON, LLC d/b/a     )
THE WILLOWS AT EAST LANSING,     )
TRILOGY HEALTHCARE OF MACOMB, LLC d/b/a     )
SHELBY CROSSING HEALTH CAMPUS and     )
THE VILLAGE AT HISTORIC SILVERCREST.     )
     )
               Defendants.     )

## AMENDED COMPLAINT
(Jury Trial Demanded)

The Plaintiffs/Relators, the United States of America and the State of Indiana *ex. rel.*

Ashley N. Vinson ("Relator Vinson"), Amanda E. Davis ("Relator Davis") and Amanda E.

Davis, individually, through counsel, Siesky & Viehe, PC, bring this action under the False

Claims Act, 31 U.S.C. §§ 3729 *et. seq.*, as amended, and the Indiana False Claims and

Whistleblower Protection Act, Ind. Code §§ 5-11-5.5 *et seq.*, as amended, against Defendants,

and allege as follows:

I.
JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§§ 1331, 1367, 31 U.S.C. § 3732 and 31 U.S.C. § 3730(b) in that the False Claims Act

specifically allows this action to be brought in any judicial district in which any one defendant

can be found, resides, transacts business, or in which any fraudulent act occurred.  Also, some of

the claims for relief in this action are brought in the name of the United States Government.

2.      This Court also has original jurisdiction over Relators' claims brought under the

Indiana False Claims and Whistleblower Protection Act as this action arises from the same

transaction or occurrence as asserted in this Amended Complaint under the False Claims Act.  31 U.S.C.        § 3732(b).

3.        This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants have minimum contacts with the United States and transacted business in the Southern district of Indiana.

4.        Venue is proper pursuant to 28 U.S.C. §§ 1391(b), 1395(a) and 31 U.S.C. § 3732(a) because Defendants operate and conduct business in this judicial district.

5.        As required under the False Claims Act, 31 U.S.C. § 3730(b)(2) and Rule 4(i) of the Federal Rules of Civil Procedure, the Relators provided the Attorney General of the United States and the United States Attorney for the Southern District of Indiana with a copy of this Amended Complaint and a disclosure of substantially all material evidence and information related to the Amended Complaint.

6.        As required under the Indiana False Claims Act, Ind. Code § 5-11-5.5-4(c)(2), the Relators have provided the Attorney General and Inspector General of the State of Indiana with a copy of this Amended Complaint and a disclosure of substantially all material evidence and information related to the Amended Complaint.

7.        This action is not barred under 31 U.S.C. § 3730(e) as there has been no public disclosure of substantially the same allegations or transactions as alleged in this Amended Complaint.  Furthermore, Relators have direct and independent knowledge of and have voluntarily disclosed to the government the information on which the allegations or transactions in this Amended Complaint are based and have provided the information to the government before filing this action.  Therefore, Relators are the "original source" according to the False

Claims Act and may bring this action even if pertinent facts have already been disclosed to the public.

II.
BACKGROUND

**A.    The Parties**

8.    At all times relevant hereto, Relator Davis resided at 7004 Sand Cherry Lane, City of Evansville, State of Indiana.

9.    Relator Davis began her employment with Defendants in March of 2011.

10.    Defendants terminated Relator Davis' employment with Defendants on or about July 5, 2013.

11.    Currently, Relator Vinson resides at 522 C Reserve Blvd., City of Evansville, State of Indiana.

12.    Relator Vinson began her employment with Defendants in or about September 2012.

13.    At all times relevant to this action, Defendant Trilogy Health Services, LLC ("Triology") was a foreign limited liability company, created under the laws of Delaware that did business within the geographic boundaries of the Southern District of Indiana and had a registered agent in the State of Indiana.

14.    At all times relevant to this action, Defendant Trilogy Rehab Services, LLC was a foreign limited liability company, created under the laws of Delaware that did business within the geographic boundaries of the Southern District of Indiana and had a registered agent in the State of Indiana.

15.     At all times relevant to this action, Defendant Paragon Rehabilitation, Inc. was a foreign corporation, created under the laws of Delaware that did business within the geographic boundaries of the Southern District of Indiana and had a registered agent in the State of Indiana.

16.     At all times relevant to this action, Defendant Paragon Outpatient Rehabilitation Services, LLC was a domestic limited liability company, created under the laws of Indiana that did business within the geographic boundaries of the Southern District of Indiana and had a registered agent in the State of Indiana.

17.     At all times relevant to this action, Defendant Tristar Home Care, LLC was a foreign limited liability company, created under the laws of Delaware that did business within the geographic boundaries of the Southern District of Indiana and had a registered agent in the State of Indiana.

18.     At all times relevant hereto, Trilogy owned and /or operated the following entities that were individual campuses located in Indiana, Ohio, Michigan or Kentucky:

|  | Name of Campus | Location | Governmental Entity for License and Billing Purposes |
|---|---|---|---|
| 1. | RIVER POINTE HEALTH CAMPUS | EVANSVILLE, IN | GOOD SAMARITAN HOSPITAL |
| 2. | OWEN VALLEY HEALTH CAMPUS | SPENCER, INDIANA | PUTNAM COUNTY HOSPITAL |
| 3. | OAKWOOD HEALTH CAMPUS | TELL CITY, IN | GOOD SAMARITAN HOSPITAL |
| 4. | HOMEWOOD HEALTH CAMPUS | LEBANON, IN | BOARD OF TRUSTEES OF THE FLAVIUS J. WITHAM MEMORAL HOSPITAL |
| 5. | AUTUMN WOODS HEALTH CAMPUS | NEW ALBANY, IN | DAVIES COUNTY HOSPITAL |
| 6. | WATERFORD PLACE HEALTH CAMPUS | KOKOMO, IN | BOARD OF TRUSTEES OF THE FLAVIUS J. WITHAM |

|  |  |  | MEMORIAL HOSPITAL |
|---|---|---|---|
| 7. | SILVER OAKS HEALTH CAMPUS | COLUMBUS, IN | HENRY COUNTY MEMORIAL HOSPITAL |
| 8. | ST. CHARLES HEALTH CAMPUS | JASPER, IN | GOOD SAMARITAN HOSPITAL |
| 9. | COVERED BRIDGE HEALTH CAMPUS | SEYMOUR, IN | JACKSON COUNTY SCHNECK MEMORIAL HOSPITAL |
| 10. | WOODMONT HEALTH CAMPUS | BOONVILLE, IN | GOOD SAMARITAN HOSPITAL |
| 11. | BETHANY POINTE HEALTH CAMPUS | ANDERSON, IN | GOOD SAMARITAN HOSPITAL |
| 12. | TRILOGY HEALTHCARE OF CYNTHIANA, LLC d/b/a CEDAR RIDGE HEALTH CAMPUS | CYNTHIANA, KY | |
| 13. | STONEBRIDGE HEALTH CAMPUS | BEDFORD, IN | JACKSON COUNTY SCHNECK MEMORIAL HOSPITAL |
| 14. | THORNTON TERRACE HEALTH CAMPUS | HANOVER, IN | DEARBORN COUNTY HOSPITAL |
| 15. | RIVEROAKS HEALTH CAMPUS | PRINCETON, IN | GOOD SAMARITAN HOSPITAL |
| 16. | ASHFORD PLACE HEALTH CAMPUS | SHELBYVILLE, IN | HANCOCK REGIONAL HOSPITAL |
| 17. | MILL POND HEALTH CAMPUS | GREENCASTLE, IN | PUTNAM COUNTY HOSPITAL |
| 18. | ST. ANDREWS HEALTH CAMPUS | BATESVILLE, IN | DEARBORN COUNTY HOSPITAL |
| 19. | HAMPTON OAKS HEALTH CAMPUS | SCOTTSBURG, IN | DAVIESS COUNTY HOSPITAL |
| 20. | SPRING MILL HEALTH CAMPUS | MERRILLVILLE, IN | HANCOCK REGIONAL HOSPITAL |
| 21. | FOREST PARK HEALTH CAMPUS | RICHMOND, IN | HENRY COUNTY MEMORIAL HOSPITAL |
| 22. | THE MAPLES AT WATERFORD CROSSING | GOSHEN, IN | HANCOCK REGIONAL HOSPITAL |
| 23. | SPRINGHURST HEALTH CAMPUS | GREENFIELD, IN | HANCOCK REGIONAL HOSPITAL |
| 24. | TRILOGY HEALTHCARE OF GLEN RIDGE, LLC d/b/a GLEN RIDGE | LOUISVILLE, KY | |

| | | | |
|---|---|---|---|
| | HEALTH CAMPUS | | |
| 25. | TRILOGY HEALTHCARE OF LOUISVILLE SOUTHWEST, LLC d/b/a PARK TERRACE HEALTH CAMPUS | LOUISVILLE, KY | |
| 26. | MORRISON WOODS HEALTH CAMPUS | MUNCIE, IN | HANCOCK REGIONAL HOSPITAL |
| 27. | COBBLESTONE CROSSING HEALTH CAMPUS | TERRE HAUTE, IN | PUTNAM COUNTY HOSPITAL |
| 28. | TRILOGY HEALTHCARE OF LOGANSPORT LLC d/b/a WOODBRIDGE HEALTH CAMPUS | LOGANSPORT, IN | BOARD OF TRUSTEES OF THE FLAVIUS J WITHAM MEMORIAL HOSPITAL |
| 29. | BRIDGEPOINTE HEALTH CAMPUS | VINCENNES, IN | GOOD SAMARITAN HOSPITAL |
| 30. | TRILOGY HEALTHCARE OF ELKHART, LLC d/b/a GREENLEAF LIVING CENTER | ELKHART, IN | BOARD OF TRUSTEES OF THE FLAVIUS J WITHAM MEMORIAL HOSPITAL |
| 31. | CREASY SPRINGS HEALTH CAMPUS | LAFAYETTE, IN | HANCOCK REGIONAL HOSPITAL |
| 32. | AVALON SPRINGS HEALTH CAMPUS | VALPARAISO, IN | HANCOCK REGIONAL HOSPITAL |
| 33. | WHITE OAK HEALTH CAMPUS | MONTICELLO, IN | BOARD OF TRUSTEES OF THE FLAVIUS J WITHAM MEMORIAL HOSPITAL |
| 34. | PRAIRIE LAKES HEALTH CAMPUS | NOBLESVILLE, IN | HANCOCK REGIONAL HOSPITAL |
| 35. | WEST RIVER HEALTH CAMPUS | EVANSVILLE, IN | GOOD SAMARITAN HOSPITAL |
| 36. | RIDGEWOOD HEALTH CAMPUS | LAWRENCEBURG, IN | DEARBORN COUNTY HOSPITAL |
| 37. | WESTPORT PLACE HEALTH CAMPUS | LOUISVILLE, KY | |
| 38. | HEARTHSTONE HEALTH CAMPUS | BLOOMINGTON, IN | DAVIESS COUNTY HOSPITAL |
| 39. | ASPEN PLACE HEALTH CAMPUS | GREENSBURG, IN | HENRY COUNTY MEMORIAL HOSPITAL |
| 40. | CEDAR CREEK HEALTH CAMPUS | LOWELL, IN | HANCOCK REGIONAL |

| | | | HOSPITAL |
|---|---|---|---|
| 41. | LAKELAND REHABILITATION & HEALTHCARE | MILFORD, IN | HANCOCK REGIONAL HOSPITAL |
| 42. | SCENIC HILLS CARE CENTER | FERDINAND, IN | GOOD SAMARITAN HOSPITAL |
| 43. | AMBER MANOR CARE CENTER | PETERSBURG, IN | GOOD SAMARITAN HOSPITAL |
| 44. | TRILOGY HEALTHCARE OPERATIONS OF SPRINGFIELD, LLC d/b/a FOREST GLEN HEALTH CAMPUS | SPRINGFIELD, OH | |
| 45. | TRILOGY HEALTHCARE OF SANDUSKY, LLC d/b/a VALLEY VIEW HEALTHCARE CENTER | FREMONT, OH | |
| 46. | TRILOGY HEALTHCARE OF PUTNAM, LLC d/b/a THE MEADOWS OF KALIDA HEALTH CAMPUS | KALIDA, OH | |
| 47. | TRILOGY HEALTHCARE OF ALLEN, LLC d/b/a RICHLAND MANOR | BLUFFTON, OH | |
| 48. | TRILOGY HEALTHCARE OF HANCOCK, LLC d/b/a THE HERITAGE | FINDLAY, OH | |
| 49. | TRILOGY HEALTHCARE OF PUTNAM III, LLC d/b/a THE MEADOWS OF LEIPSIC HEALTH CAMPUS | LEIPSIC, OH | |
| 50. | TRILOGY HEALTHCARE OF ALLEN II, LLC d/b/a SPRINGVIEW MANOR | LIMA, OH | |
| 51. | TRILOGY HEALTHCARE OF OTTAWA, LLC d/b/a GENOA RETIREMENT VILLAGE | GENOA, OH | |
| 52. | TRILOGY HEALTHCARE OF HAMILTON, LLC d/b/a TRIPLE CREEK RETIREMENT COMMUNITY | COLERAIN, OH | |
| 53. | TRILOGY HEALTHCARE OF BELLEVUE LLC d/b/a THE WILLOWS AT BELLEVUE | BELLEVUE, OH | |
| 54. | TRILOGY HEALTHCARE OF NORTH BALTIMORE LLC d/b/a BRIAR HILL HEALTH CAMPUS | NORTH BALTIMORE, OH | |
| 55. | TRILOGY HEALTHCARE OF MONTGOMERY, LLC d/b/a | ENGLEWOOD, OH | |

|  | | | |
|---|---|---|---|
|  | CYPRESS POINTE HEALTH CAMPUS | | |
| 56. | TRILOGY HLEATHCARE OF GREENVILLE, LLC d/b/a VILLAGE GREEN HEALTHCARE CENTER | GREENVILLE, OH | |
| 57. | TRILOGY HEALTHCARE OF PUTNAM II, LLC d/b/a THE MEADOWS OF OTTAWA | OTTAWA, OH | |
| 58. | TRILOGY HEALTHCARE OF BATTLE CREEK LLC d/b/a THE OAKS AT NORTHPOINTE WOODS | BATTLE CREEK, MI | |
| 59. | TRILOGY HEALTHCARE OF JACKSON, LLC d/b/a RIDGECREST HEALTH CAMPUS | JACKSON, MI | |
| 60. | TRILOGY HEALTHCARE OF OAKLAND, LLC d/b/a WESTLAKE HEALTH CAMPUS | COMMERCE, MI | |
| 61. | ST. ELIZABETH HEALTHCARE CENTER | DELPHI, IN | BOARD OF TRUSTEES OF FLAVIUS J WITHAM MEMORIAL HOSPITAL |
| 62. | TRILOGY HEALTHCARE OF TIPPECANOE, LLC d/b/a CUMBERLAND POINTE HEALTH CAMPUS | WEST LAFAYETTE, IN | BOARD OF TRUSTEES OF FLAVIUS J WITHAM MEMORIAL HOSPITAL |
| 63. | ST. MARY HEALTHCARE CENTER | LAFAYETTE, IN | BOARD OF TRUSTEES OF FLAVIUS J WITHAM MEMORIAL HOSPITAL |
| 64. | TRILOGY HEALTHCARE OF JEFFERSON, LLC d/b/a FRANCISCAN HEALTHCARE CENTER | LOUISVILLE, KY | |
| 65. | BLAIR RIDGE HEALTH CAMPUS | PERU, IN | BOARD OF TRUSTEES OF FLAVIUS J WITHAM MEMORIAL HOSPITAL |
| 66. | TRILOGY HEALTHCARE OF FAYETTE I, LLC d/b/a THE WILLOWS AT HAMBURG | LEXINGTON, KY | |
| 67. | TRILOGY HEALTHCARE OF FAYETTE III, LLC d/b/a THE WILLOWS AT CITATION | LEXINGTON, KY | |
| 68. | GLEN OAKS HEALTH CAMPUS | NEW CASTLE, IN | HENRY COUNTY |

|  |  |  | MEMORIAL HOSPITAL |
|---|---|---|---|
| 69. | TRILOGY HEALTHCARE OF MORGAN, LLC d/b/a HIGHLAND OAKS HEALTH CENTER | MCCONNELSVILLE, OH | |
| 70. | TRILOGY HEALTHCARE OF MUSKINGUM, LLC d/b/a THE OAKS AT NORTHPOINTE | ZANESVILLE, OH | |
| 71. | TRILOGY HEALTHCARE OF LUCAS, LLC d/b/a THE LAKES OF MONCLOVA | MONCLOVA, OH | |
| 72. | TRILOGY HEALTHCARE OF HURON, LLC d/b/a THE WILLOWS AT WILLARD | WILLARD, OH | |
| 73. | TRILOGY HEALTHCARE OF MUSKINGUM II, LLC d/b/a THE OAKS AT BETHESDA | ZANESVILLE, OH | |
| 74. | TRILOGY HEALTHCARE OF INGHAM, LLC d/b/a THE WILLOWS AT OKEMOS | OKEMOS, MI | |
| 75. | TRILOGY HEALTHCARE OF GENESSEE, LLC d/b/a THE OAKS AT WOODFIELD | GRAND BLANC, MI | |
| 76. | STONEGATE HEALTH CAMPUS | LAPEER, MI | |
| 77. | TRILOGY HEALTHCARE OF CLINTON, LLC d/b/a THE WILLOWS AT EAST LANSING | EAST LANSING, MI | |
| 78. | TRILOGY HEALTHCARE OF MACOMB, LLC d/b/a SHELBY CROSSING HEALTH CAMPUS | MACOMB, MI | |
| 79. | THE VILLAGE AT HISTORIC SILVERCREST | NEW ALBANY, IN | BOARD OF TRUSTEES OF THE FLAVIUS J WITHAM MEMORIAL HOSPITAL |

19.    As the above chart indicates, some of the campuses contracted or entered into a lease agreement with County owned hospitals.  For the particular campus, the County owned hospital then became the licensee in order to bill Medicare and/or Medicaid at a higher reimbursement rate.

20.     On or about December 2, 2015, Defendant NorthStar Healthcare Income, Inc. and Griffin-American Healthcare REIT III announced that they, as part of a joint venture, had completed the acquisition of Trilogy Investors, LLC, the parent company of Trilogy Health Services, LLC and subsidiaries for $1.125 billion.  Under the arrangement, NorthStar Healthcare owns 30% of the joint venture, while Griffin-American owns 70% of the joint venture.

**B.     The Federal False Claims Act ("FCA")**

21.     The FCA provides, in pertinent part, that any person who:

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C)     conspires to commit a violation of subparagraph (A), (B) . . .
>
> * * *
>
> is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation.

**C.     The Indiana False Claims and Whistleblower Protection Act**

22.     The Indiana False Claims and Whistleblower Protection Act provides, in pertinent part, that a person who knowingly or intentionally:

> (1)     presents a false claim to the state for payment or approval;
> (2)     makes or uses a false record or statement to obtain payment or approval of a false claim from the state; [or]
> (7)     conspires with another person to perform an act described in subdivisions (1) through (6) . . .
>
> * * *
>
> is . . . liable to the state for a civil penalty of at least five thousand dollars ($5,000) and for up to three (3) times the amount of damages sustained by the state. In

addition, a person who violates this section is liable to the state for the costs of a civil action brought to recover a penalty or damages.

Ind. Code § 5-11-5.5-2(b)(1)-(2), (7).

### D.    Defendants' Billing to the Government

23.    Defendants own and operate approximately eighty (80) or more skilled nursing facilities ("SNF") located in the Midwest including in Indiana, Michigan, Ohio and Kentucky.

24.    Defendants bill Medicare and Medicaid for services.

25.    Medicare is a federally funded insurance program that provides health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 426, 426A.

26.    Medicare has four parts, each part covering different services.

27.    Medicare Part A covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

28.    Medicare Part A covers up to hundred (100) days of skilled nursing and rehabilitation post-hospital care if the following conditions are met:

    a.    The patient requires skilled nursing care and/or skilled rehabilitation services on a daily basis;

    b.    These services, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; and

    c.    The services are provided to address a condition for which the patient received inpatient hospital services or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay).

*See* 42 U.S.C. § 1395d(a)(2)(A) and § 1395f(a)(2)(B).

29.    Medicare Part A will only cover those services that are reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary).

14

30.     In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l (e).

31.     Medicare pays a SNF a pre-determined daily rate for each day of skilled nursing and rehabilitation services.

32.     The daily rate that Medicare pays a nursing facility depends, in part, on the Resource Utilization Group (RUG) to which a patient is assigned.

33.     Each RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

34.     There are generally five rehabilitation RUG levels:

      a.     Rehab Ultra High ("RU");
      b.     Rehab Very High ("RV");
      c.     Rehab High ("RH");
      d.     Rehab Medium ("RM"); and
      e.     Rehab Low ("RL").

35.     The rehabilitation RUG level to which a patient is assigned depends on the number of skilled therapy minutes a patient received, the number of days a patient receives therapy and the number of therapy disciplines the patient received during a seven-day assessment period.  These are the requirements for the five rehabilitation RUG levels:

      a.   Rehab Ultra High: minimum 720 minutes per week total therapy combined

15

from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week;

b.   Rehab Very High: minimum 500 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week;

c.   Rehab High: minimum 325 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week;

d.   Rehab Medium: minimum 150 minutes per week total therapy; must be provided at least 5 days per week but can be any mix of therapy disciplines; and

e.   Rehab Low: minimum 45 minutes per week total therapy; must be provided at least 3 days per week but can be any mix of therapy disciplines.

63 Fed. Reg. at 26,262.

36.   For purposes of calculating RUG levels, fifteen minutes of therapy constitutes a "day" of skilled therapy.

37.   Medicare pays the most for those beneficiaries that fall into the Ultra High RUG level.  The Ultra High RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time."  63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

38.   SNFs are required periodically to assess each patient's clinical condition, functional status, and expected and actual use of services, and to report the results of those assessments.  These assessments are the basis for determining the patient's RUG level and, therefore, the daily rate that Medicare will pay SNF to provide services to that patient.

39.   Generally, the RUG level determines Medicare payment prospectively for a defined period of time.  *See* 63 Fed. Reg. at 26,267.[1]

40.   In addition to RUG levels, Patients' activities of daily living ("ADL"s) are

---

[1] For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

measured by certified nurse assistants ("CNA"s) or nurses.

41.     The four (4) ADLs that impact patient reimbursement are bed mobility, transfers, toileting and eating.

42.     The measurement of ADLs are a combination of patient self performance and the amount of staff assistance provided.

43.     A higher ADL score (more assistance provided by CNA or nurse) equates to a higher reimbursement.

44.     The Health Insurance Association of America describes Medicaid as a "government insurance program for persons of all ages whose income and resources are insufficient to pay for health care."

45.     The Indiana, Kentucky and Ohio Medicaid Programs are joint federal and state programs that reimburse providers for necessary medical services to eligible persons who are not able to pay for such services.

46.     The federal government funds a portion of the Indiana, Kentucky and Ohio Medicaid money and the States provide the balance of the funds.

47.     The Indiana, Kentucky and Ohio Medicaid Programs are a health care benefit programs as defined by 18 U.S.C. § 24.

48.     So, patients who do not have the financial means to afford nursing home care can potentially be eligible for Medicaid to pay for a stay and treatment at a SNF.

49.     A SNF's reimbursement rate is determined, in part, by the SNF's case mix.

50.     Case mix can be thought of as the acuity of the patients at the SNF.  The higher the acuity level of the patients captured on the Minimum Data Set (MDS) submitted to Center for Medicare and Medicaid Services ("CMS") for a particular SNF, the higher the Medicaid

reimbursement for the SNF.

51.     As explained below in detail, Defendants engaged in a scheme to maximize

Medicare and Medicaid reimbursement without regard to medical needs of the patients.

III.
FRAUD

**A.     Defendants' Mission, Budgets and Goals**

52.     The overall mission of the Defendants was to maximize Medicare and Medicaid

reimbursement regardless of patient needs.

53.     In a presentation to corporate home office, Executive Directors from campuses

company-wide (Indiana, Ohio, Michigan and Kentucky), Randall Bufford, the CEO/President of

Trilogy, provided the following slide:

CLINICAL CASE MIX COMPARISON

| Company | Ensign | Kindred | Genesis | Trilogy |
|---|---|---|---|---|
| MDCR Rates | $564 $81 or 16.7% | $560 $77 or 15.7% | $533 $50 or 10.3% | $483 14.2% < Comparison |
| MDCD Rates | $184 $32 or 21.1% | $211 $59 or 38.8% | $182 $30 or 19.7% | $152 26.3% < Comparison |

Not sure of issues and solutions, but know we should be doing better!

54.     Relator Vinson worked for Defendants in a job title known as Divisional Support

– Resident Assessment.  However, Relator Vinson functioned to support the MDS coordinators

at twelve (12) Trilogy campuses in and around Southern Indiana.  The campuses that Relator

Vinson oversaw include:

• West River Health Campus (Evansville);

• Riverpointe Health Campus (Evansville);

- River Oaks Health Campus (Princeton);

- Bridgepointe Health Campus (Vincennes);

- Cobblestone Crossings Health Campus (Terre Haute);

- Harrison's Crossing Health Campus (Terre Haute);

- Woodmont Health Campus (Boonville);

- Oakwood Health Campus (Tell City);

- Scenic Hills Care Center (Ferdinand);

- St. Charles Health Campus (Jasper);

- Amber Manor Care Center (Petersburg); and

- The Villages of Oak Ridge (Washington).

55.     In addition to knowledge of the campuses listed above, Relator Vinson was trained at the corporate level and has extensive knowledge of Defendants' training manuals, policies, practices and procedures that pertain to all of the Defendants' campuses located in Indiana, Kentucky, Michigan and Ohio.

56.     Relator Vinson was pushed by Amy Miller, Director of Resident Assessment, for all of Trilogy and Divisional Vice Presidents to increase Medicare reimbursement rates.

57.     Specifically, the Defendants targeted a high daily Medicare rate per patient.  In fact Defendants budgeted for a specific daily Medicare rate per patient company-wide.

58.     Moreover, the Defendants also have a daily Medicare rate per patient budget that is specific to each campus.  The expectation is that each Executive Director of Defendants' campuses will meet the target regardless of patient needs.  This expectation is communicated from the very top of the corporate hierarchy and is consistently enforced by Divisional Vice-

Presidents, Director of Assessment Support and Assessment Support including Relator Vinson.

59.     For example, when a campus fell below its budgeted daily Medicare rate for

patients, Amy Miller (Director of Assessment Support), Rhonda Warner (Current Divisional

Vice President) and James Chambers (former Divisional Vice President) would call or visit with

Relator Vinson and Denise Stetter (Area Director of Therapy) and have Relator Vinson and

Denise Stetter do joint visits to campuses under budget to find ways to increase Medicare rates to

or above budget.  Campus visits by Denise Stetter and Relator Vinson for budget concerns

included, but were not limited to, Riverpointe (Evansville), Woodmont (Boonville), West River

(Evansville), Scenic Hills (Ferdinand) and St. Charles (Jasper).

60.     During these visits, Relator Vinson and Denise Stetter would sit through clinical

care meetings attended by the Executive Directors, Director of Health Services, Assistant

Director of Health Services, Program (Rehab) Director and MDS Coordinator.  Relator Vinson

and Denise Stetter also attended Medicare meetings at the campuses.  Denise Stetter had access

to Casamba (therapy software) and made patient care decisions without first consulting with the

treating therapists or seeing the patients.

61.     Below is an example email sent to Denise Stetter following such a budget visit for

Woodmont (Boonville) that evidences this corporate practice:

>       Thank you so much for taking the time to come to Woodmont and
>       educate us on improving our processes to help increase our rates ☺
>
>       Vicky Harpenau
>       Executive Director
>       Woodmont Health Campus

62.     Likewise, an email from Relator Vinson to Briana Crutchfield, the Executive

Director of Bridge Pointe Health Campus (Vincennes) and Denise Stetter states, in relevant part,

as follows:

> I was at Vincennes today and reviewed Medicare rates (RUGs &
> ADLs) and Medicare Budget.  Financials related to Medicare rates
> are projected to be above budget for May. Assessments were
> modified for accurate ADLs (RUA -> RUC). Chris is doing an
> excellent job following up on Care tracker compliance. The
> campus is achieving the standard of 95% compliance. Thank you.
> Also, I spent some time with Larry and he was very receptive
> today. We reviewed the Campus' Budgeted Medicare rate per
> resident per day and what percentage of RU and RVs would
> exceed that. He is going to pay attention to that and Chris and
> Suzanne are going to focus on ADLs. Improvements have been
> made this month following our last visit related to Med A rates.
> Several COTs are being done that because of refusals or doctors
> appointments ect. Maybe we can increase minutes at the beginning
> of each week so if one day near the ARD the resident is unable to
> participate as planned they will have received the same amount of
> minutes… Or do this on the frequent COT residents. Also, I would
> encourage increased communication if the resident refuses
> Therapy. If Larry could notify Brianna [sic] or another department
> leader could follow up and reapporach the resident. I will return to
> the Campus on the 14th of June to attend Medicare Meeting that
> day. If I can assist with anything else please let me know. Have a
> great week start!

Larry, who is mentioned in this email, was the Program Director (or Rehab Director) for Bridge

Pointe Health Campus. Rhonda Warner (Divisional Vice President) was copied on this email.

63.     This corporate pressure had a direct impact on Medicare and Medicaid

reimbursement, Defendants' employees at the various campus locations and negatively

impacted patient care and well-being.

**B.     Medicare Rates**

64.     Defendants manipulated RUG levels and ADLs to fraudulently increase

Medicare Reimbursement rates.

65.     Defendants utilized a software program known as MDSI Intelligence to capture

data from all campuses and identify "opportunities" to increase Medicare Part A reimbursement

for RUG levels and ADLs.

66.     Executive Directors for each campus, Director of Health Services, MDS

Coordinators and Corporate home office and other personnel had access to the MDSI software.

67.     The MDSI has two parts.  One part was for quality of care and survey outcomes.

The second part of MDSI is financial analysis.

68.     The financial analysis portion of the MDSI software tracked ADLs and minutes

of therapy for each patient.

69.     The financial analysis portion of the MDSI software provided reports that

identified both:

- Additional minutes of therapy provided at a RUG level that did not
  equate to additional Medicare reimbursement and;

- minutes and days of therapy needed to bump a patient to a higher RUG
  level and thus higher Medicare reimbursement; and

- ADL points needed to bump a patient to the next RUG level and thus
  higher Medicare reimbursement.

70.     The financial portion of the MDSI software had no regard for patient needs or

for the medical necessity of the therapy or ADLs.

71.     Before MDS Coordinators submit the MDS assessments to CMS, the MDS

assessments are uploaded to the MDSI software.  Reports can then be generated that identify the

opportunities to increase Medicare reimbursement.

72.     The MDSI software translates these "opportunities" into actual dollars that the

Defendants could have saved or into dollars that the Defendants could have profited.

73.     For example, if a patient was provided 700 minutes of skilled therapy in a week,

the MDSI software would flag the opportunity to provide 20 more minutes of skilled therapy

minutes in a week to bump the patient to the next RUG level (Ultra High) and command a

higher Medicare reimbursement.  The MDSI software would also then translate this missed

opportunity into the average dollar rate difference per day with the number of days it impacted.

The total potential revenue increase was then detailed.

74.     Likewise, the MDSI software also tracks the number of days patients receive

therapy in order to identify opportunities to add a day or days of therapy to achieve the next

RUG level.

75.     As to saving Defendants' labor costs, the system flags when a patient receives

therapy minutes that are beyond the minimum number of minutes needed to reach a RUG level.

So, if a patient were at the Ultra High RUG of 720 skilled therapy minutes per week and the

patient was actually provided 750 minutes of skilled therapy for a week, then the MDSI

software would flag the cost per minute of providing the 30 minutes of therapy each week

above the minute amount of therapy minutes to achieve the Ultra High RUG level (720 minutes

per week).

76.     These MDSI RUG level and ADL opportunity reports are reviewed at leadership

meetings attended by all divisional vice presidents, CEO and all vice-presidents.

77.     From the leadership meetings that occur every month or so, the missed

opportunities detailed by the MDSI RUG level and ADL are communicated to Assessment

Support, such as, Relator Vinson by the divisional Vice President and/or Director of

Assessment Support, Amy Miller.

78.     The message to Relator Vinson was plain that if there were a lot of opportunities

that the situation would need to be fixed.

79.     Below is an email from Amy Miller, Director of Assessment Support, to all of

MDS Support persons that evidences just how the MDSI reports dictated RUG levels and ADL:

> Good evening – I was working on Leadership reports and decided to run the opportunity reports from MDSI. I am not sure if this is something you all are reviewing with your campuses. If it isn't, I think we need to start. The money that is potentially (I realize we cannot capture all of this) left on the table is staggering. I believe many campuses either didn't get in the habit of reviewing MDSI or got away from it. I think as we visit, we need to be reviewing these reports with the ED/ DHS/ MDS; maybe not every visit, but periodically.

All of the RUG levels and ADL opportunities identified by MDSI for 2013 were attached to this email with the financial impact for each campus.

       80.      Relator Vinson would then contact either by phone or email the MDS Coordinators and/or Program (or Rehab) Directors at the campuses that were missing opportunities and question them on why opportunities were missed.  Below are examples of emails from Relator Vinson to MDS Coordinators and/or Program (or Rehab) Directors concerning missed RUG level opportunities flagged by the MDSI software:

Example #1:  This email was to Cheryl Lawalin, the MDS Coordinator at Oakwood Health Campus (Tell City) with a subject line "MDSI":

> Good Monday ☺ I am reviewing MDSI… Your Campus triggers for a "Therapy Opportunity." Do you know why **Patient AR** on 4/2 only received 4 days of therapy. Does Jill understand the need now for 5 days of therapy to get a rehab RUG? Wasn't sure if this was an educational opportunity for therapy. It doesn't appear that she has discharged from the Campus ☺ Fill me in~ Thanks for all you do!!!!!!!!

Example #2:  This email Tessa Holland, the program (or rehab) director at Stonebridge Health Campus (Bedford) with a subject line "May Therapy Opportunities":

> Tessa,
> These are therapy opportunities listed in MDSI. Do you have any insight why **Patient AS** was an RMA instead of an RHA & **Patient AT** was unable to be an RMC???? I'm sure they were prob ill or discharged unexpectedly just wasn't for sure ☺ Thanks so

much for your assistance!!!!

Example #3:  This email was sent to Christina Hoalt, MDS coordinators at Bridge Pointe Health

Campus (Vincennes) with a subject line "May therapy opportunities :)":

> Chris & Susan,
> You only have 1 therapy opportunity listed for May. It is **Patient**
> **AU**. She only needed 32 minutes to be an RU. Is this accurate??
> Do you know why they weren't an RU??
> Thanks so much for your assistance!!!!

81.     Relator Vinson would also communicate with Denise Stetter about the therapy

opportunities that MDSI flagged.

82.     Denise Stetter, the area manager of therapy, then would follow-up with Program

(or Rehab) Directors for each campus to make sure that there were no missed RUG level

opportunities in the future.

83.     None of this manipulation of RUG levels or skilled therapy minutes had

anything to do with patient care or medical necessity.  The sole focus was money.

1.     Manipulation of RUG Levels

84.     Relator Davis worked for Defendants primarily at the River Pointe Health

Campus as an Occupational Therapist.  However, Relator Davis worked at Defendants' other

facilities in and around southern Indiana.  At these facilities, Relator Davis first-hand corporate

pressure employees at the campus level to engage in fraudulent practices.

85.     In a nutshell, the corporate pressure to commit fraud to increase or manipulate

RUG levels consisted of the following:

- Defendants billed the Government for medically unreasonable and unnecessary and unskilled services;
- Defendants set and enforced Ultra High RUG level and length of stay targets;
- Defendants at the corporate level pushed managers to increase Ultra High levels during facility visits;

- In turn, managers pushed therapists to increase Ultra High levels and lengths of stay;
- Defendants punished or rewarded facilities, managers and therapists depending upon Ultra High levels and lengths of stay;
- Defendants provided excessive therapy services with limited physician oversight, knowledge or involvement;
- Therapy was excessive in terms of frequency, duration and intensity;
- Due to corporate pressure, therapy was potentially harmful to patients;
- Defendants pushed for modalities that were unnecessary and of unreasonable duration to increase the number of minutes of therapy required;
- Defendants billed Medicare for services provided to Medicare beneficiaries whom should have been discharged from therapy; and
- Defendants billed Medicare for services that were not medically necessary or did not require the skills of a rehabilitation therapist at all.

These fraudulent practices are explained in detail below and examples are provided.

86.     Medicare pays significantly more money for Ultra High beneficiaries than for beneficiaries at lower RUG levels.

87.     For this reason, Defendants pushed its therapists to get as many of its Medicare beneficiaries into the Ultra High RUG level as possible, with little regard to the individualized needs of its Medicare patients.

88.     Defendants also pressured its therapists to extend their Medicare beneficiaries' stays in its facilities to maximize Medicare revenue.   This practice ignored patient needs and sometimes resulted in beneficiaries unnecessarily exhausting all hundred (100) days of their Medicare SNF benefit (leaving the beneficiaries with no Medicare Part A coverage for at least 60 days if the beneficiaries later actually needed skilled nursing or rehabilitation care).

89.     These corporate pressures caused Defendants therapists to provide excessive amounts of therapy that were not medically reasonable or necessary.

90.     Because the corporate targets were based in part on providing a specific number of therapy minutes per Medicare patient, therapists often did not meaningfully follow

individualized plans of care for patients.

91.     In addition, the corporate pressure caused Defendants' therapists to provide services that did not qualify as skilled rehabilitation therapy simply to meet Defendants' demands of higher Ultra High targets.

92.     In order to maximize its Medicare revenue, Defendants developed and enforced a corporate culture to set targets for the percentage of Medicare rehabilitation days it wanted to bill at the Ultra High level.  For instance, Courtney, Tessie and Denise would tell therapists not to ramp down patients in terms of RUG levels because Defendants have expectation of reimbursement.

93.     Defendants also set targets for the average length of stays of Medicare patients at its facilities.  Defendants set these targets at the corporate level without any knowledge of or regard for the individualized medical needs of its Medicare beneficiaries and in disregard to therapist recommendations.

94.     Defendants conveyed and reinforced its Ultra High RUG and length of stay targets in many ways, including "education" at meetings and presentations wherein therapists were strongly encouraged to use "tools" to increase the length of stays. Denise, from Defendants' corporate hierarchy, would visit Defendants' SNF facilities to conduct these meetings.

95.     For example, therapists were asked to review the software program Casamba and Marilyn Winkle, Clinical Support Specialist for Paragon, encouraged therapists to include in evaluations the rehab potential of "good" or "great" regardless of the true rehab potential of the patient because a "fair" or "poor" may be denied by Medicare for reimbursement.

96.     An example of a "tool", is that Defendants pushed its therapists to hold patients

at its SNF (instead of discharging) for pain alone, when the patient could have had pain

management at an outpatient facility or setting.  For its patient population, Defendants set a ten

percent (10%) goal of adding a CPT code for modalities, such as, e-stim and ultrasound to assist

with maintaining Ultra High Rug levels in patients with more serious health complexities and

with patients that were not compliant with a rehab plan.

97.     Among the tips that Defendants' corporate offered, without having met, seen, or

evaluated a single patient, was that an increase of only a few minutes per day in a discipline can

mean an increase over days of a RUG level.

98.     At an action meeting attended by Paragon Directors and Amy Miller, the Director

of Assessment Support, in March of 2014, the directors were instructed or told to question each

campuses' leadership in terms of nurse "therapy holds".  Specifically, the were to question

whether or not patients had to have all treatment withheld or whether they could tolerate fifteen

(15) minutes of therapy in the patients' beds.  The importance of having the fifteen minutes of

therapy was to enable the therapy to be counted as a "day" of therapy.

99.     Defendants reinforced its Ultra High RUG targets through the mantra that

"everyone admitted will receive 2+ hours of therapy per day."  This mantra was enforced by

Rehab Directors, such as Tessie at River Pointe in Evansville, Indiana.

100.    For example, the corporate culture was that therapists were expected to start at 2+

hours of therapy and adjust from there.

101.    Defendants made its therapists argue with Rehab Directors to prove that a patient

did not need 2+ hours of skilled therapy per day.  Likewise, therapist had to argue with Rehab

Directors to discharge a patient.  In some divisions, Rehab Directors had to submit regular

emails to their Area Managers and other regional staff to justify why particular beneficiaries

failed to qualify for the Ultra High RUG level or why beneficiaries were ramped down from

Ultra High to a lower RUG level.  The same was true if a therapist wanted to discharge a

patient.  Specifically, Courtney, a Rehab Director at River Pointe, confided in Relator Davis

that she was being pressured by corporate (Paula an Area Manager at the time and Ron Lemond

the Vice President who oversaw the rehabilitation services for Defenant at the time).  The same

thing was communicated to Relator Davis and other staff by Tessie, a subsequent Rehab

Director.  In fact, Tessie said that her job was on the line when Relator Davis attempted to

discharge several patients in a week.

102.    The Area Rehab Manager for southern Indiana questioned the Rehab Director

for River Pointe as to why a therapist failed to reach the targeted RUG level.  Normally in this

situation, the patient was switched to a different therapist or given to a physical therapy

assistant ("PTA").

103.    At River Pointe, Rehab Directors, such as, Tessie (a speech therapist) or

Courtney (a certified occupational therapy assistant "COTA"), challenged physical therapists

and occupational therapists' evaluations of the need of rehabilitation therapy for each patient

even though they were not a physical or occupational therapist, but rather a speech therapist

(Tessie) or COTA (Courtney).

104.    Relator Davis received texts from her Rehab Director asking her to add minutes

due to just barely missing the number of minutes required for the next RUG level.  Further, the

Rehab Director texted Relator Davis and asked Relator Davis to add several minutes in order to

add another unit for Part B patients.

105.    "Medicare" meetings took place weekly (normally every Tuesday).  At these

meetings, the Executive Director, Rehab Director, activities director, social services director

and the director of nursing met to discuss discharges of Part A patients.

106.    Therapists had Medicare sheets, which detailed every patient and the therapists' recommendation for discharge.  These Medicare sheets were provided to the Rehab Director and brought to the Medicare Meetings.  However, the recommendations from the treating therapist (as detailed on the Medicare sheets) were routinely disregarded and overruled by those at the Medicare meeting.  Inexplicably, there was no communication with the therapists as to why there clinical judgment as to discharge was rejected.  And, therapists were strictly forbidden by Defendants to discuss or even mention the word or topic of discharge with patients or their families.

107.    Other action plans focused on increasing the length of stay through Defendants' delaying of discharge.  For instance, Defendants implemented a discharge policy whereby a checklist had to be completed by therapist before a therapist was allowed to discharge a patient. Defendant employees viewed the checklist as an artificial means of extending a patient's length of stay; it was frequently used to elongate patient stays by waiting to address home skills training until the end of a patient's stay, when they were already ready for discharge, rather than incorporating that training throughout the duration of the stay.  Moreover, the checklist included billing Medicare for unskilled care, such as taking beneficiaries grocery shopping and watching them clean; improper billing for "therapy" that was provided in groups or concurrently, not individually; and typically involved double-billing Medicare for the same activities.

108.    Other activities on the list were such things as changing the oil in a vehicle, which was an inappropriate consideration for many patients because the patient population was largely elderly.  Another home skill was medication management.  This skill was pushed for even dementia patients with severe deficits.

109.    The Defendants' Area Manager regularly visited River Pointe, sometimes on a monthly or weekly basis.  Although they reviewed a number of factors, the Area Manager focused particularly on pushing the facilities to increase the number of Ultra High billable minutes and increase Part B caseload.  The Area Managers used coaching or counseling for pushing these goals.

110.    Defendants' policies were clear that Rehab Managers were responsible for meeting RUG targets.

111.    Rehab Managers employed different methods to highlight for their therapists those beneficiaries who were in their assessment periods and the number of minutes that the therapists had to get that day to reach the Ultra High RUG level.

112.    Rehab Managers frequently pushed therapists to approach beneficiaries multiple times a day, sometimes as many as 7 or 8 times, in order to meet the number of assigned minutes, even after repeated refusals by the beneficiaries.

113.    Many Rehab Managers confronted therapists who failed to provide the assigned number of minutes or missed the Ultra High RUG level and forced them to write memoranda explaining why they were unable to attain the minutes.  Therapists who missed minutes were told how much money they were costing the company.

114.    While pressuring those facilities and employees that failed to meet its Ultra High and average length of stay targets, Defendants applauded and rewarded those employees and facilities that met or exceeded its targets.

115.    Notwithstanding the dramatic increases in Ultra High percentages and average lengths of stay, Defendants never questioned or examined whether these increases were legitimate or the result of medically unnecessary, unreasonable, or unskilled services.

116.    Medicare requires that physicians or certain other practitioners certify, and then recertify on a regular basis, to the medical necessity of a patient's treatment in a skilled nursing facility.  A physician must also sign written orders for therapy- before the therapy starts- which typically includes approving the therapy plan of care or the frequency and duration of therapy.

117.    In practice, the certifications were commonly signed days or weeks after the patient was admitted, or sometimes were not signed at all.  Rather than the physician evaluating the patient, or talking with the therapist who had performed an evaluation, and then prescribing an order for the duration and frequency of therapy, therapists would frequently begin therapy treatments, then write up the therapy orders and only then obtain physician approval.  All without ever having met the patient or performed an independent evaluation and without knowing whether the therapy was reasonable, useful, or even medically necessary.

118.    Many physicians, who often lacked knowledge and training in rehabilitation therapy, relied heavily on therapists to propose a frequency and duration of therapy that was appropriate for the individual patient, knowing that Defendants had actually set those amounts to meet corporate target RUG levels.

119.    As to River Pointe, from August of 2014 to September of 2015, hundreds of Medicare certifications were either incomplete, not signed at all or signed by a nurse practitioner employed by Defendants.  These certifications should have been signed by a physician, not employed by Defendants.

120.    The problems with certifications were not isolated to River Pointe's campus. Mindy Lankenau, VP of Clinical Services with Paragon (she is listed as VP / Chief Compliance Officer for Trilogy), states in an email dated December 7, 2015: "[a]greed.  Physician certifications continue to be a concern everywhere! . . ."

121.     In order to meet Defendants' aggressive and oftentimes unrealistic Ultra High

and average length of stay targets, Defendants' therapists frequently provided services that were

medically unreasonable, unnecessary, and unskilled.  Instead of developing individualized plans

of care that were tailored to a patient's unique clinical characteristics and needs, Defendants'

therapists commonly churned their Medicare beneficiaries through rote exercises that provided

little clinical benefit and served only to inflate the number of minutes Defendants could report

and bill to Medicare.

122.     As a result of Defendants' constant push for billable minutes, its therapists

regularly provided services that were medically unreasonable, unnecessary, and unskilled for a

variety of non-exclusive, overlapping reasons.  As illustrated by the examples below,

Defendants' therapists subjected many Medicare beneficiaries to Ultra High levels of therapy

when their clinical characteristics and physical condition indicated that they could not be

reasonably expected to participate in, much less benefit from, those levels of intensive therapy.

123.     Defendants' therapists provided and billed Medicare for therapy that was

excessive in frequency, duration, or intensity for beneficiaries who could not be reasonably

expected to benefit from skilled therapy.

124.     Also, Defendants' therapists provided, and Defendants billed for, therapy that

sometimes jeopardized the health of Medicare patients who were imminently terminal, fatigued,

sick, or otherwise medically unstable.

125.     **Patient A** was in his 60s when he was admitted in December of 2012.  Patient A

suffered from severe end-stage respiratory failure – COPD exacerbation and was on 6 liters of

oxygen.  He was very weak and frail.  Patient A received both OT and PT.  However, he could

not tolerate the therapy.  Patient A was admitted twice.  The first time, Patient A was receiving

72 minutes of therapy (co-treated by OT and PTA).  Then he went to hospital.  However, his oxygen level dropped at hospital to 60% – 70%, so he was discharged from the hospital and readmitted again to River Pointe.  Patient A was a Medicare Part A beneficiary who received 500 minutes of therapy.  He was dying and not appropriate for therapy.  Instead, Patient A should have been a hospice patient.  Rehab Director Tessi pushed therapist to render treatment even though it served no benefit to patient and even hurt him.  He was gasping for air during therapy attempts.  He would sit up at the end of bed and do passive range of motion of arms and legs.  Patient A died on a day of treatment.

126.    **Patient B**, a non-verbal elderly male with severe end-stage dementia was a Part A Medicare beneficiary admitted in February of 2013.  Relator Davis tried to discharge Patient B as he already met his prior level of function and Relator Davis argued with Rehab Director Tessi regarding this discharge.  Indeed, he would always require assistance with transferring and with the commode.  There were no skilled services and no restorative program being provided to this patient.  Yet, Patient B was kept for 100 days anyway.  The purported rationale for keeping him was "he will get worse if we let him go."

127.    **Patient C**, also a Part A Medicare beneficiary, was admitted in March of 2013.  At first, Patient C was medically appropriate for therapy due to cognitive deficits and fall risk.  Patient C was provided with PT and OT, 720 minutes.  Then, Patient C stopped eating, experienced a rapid decline and strong abdominal pains.  Patient C became bedridden, couldn't speak and was lethargic.  Relator Davis argued that Patient C should go to hospital and be discharged as therapy was not appropriate and it may hurt Patient C.  Nevertheless, Patient C was co-treated and continued to provide treatment.  There was no skilled therapy provided.  Rehab Director Tessi took patient off of Relator Davis' list and assigned an OTA.   The therapy

billed to Medicare consisted of sitting by Patient C's bed, doing passive range of motion and encouraged her to eat. Patient C was discharge to the Deaconess hospital and died shortly thereafter.

128.   **Patient D**, a Part A Medicare beneficiary, was receiving 720 minutes treatment with all 3 disciplines treating (OT/PT/ST). Patient D was admitted due to lower extremity fracture due to a fall. Patient D had a decline in cognition and was no longer able to live at home. OT/PT had made numerous recommendations for discharge due to patient meeting maximum rehabilitation potential and would always require 24-hour supervision and supervision at all times while in standing due to poor safety awareness and fall risk. Therapists were told that Patient D would be discharging to Defendants' assisted living facility and a room was not ready yet and she needed to remain on skilled therapy services in order for the family to not have to pay out of pocket expenses until a room became available. Rehab Director continued to ignore therapists for weeks and eventually let OT/PT discharge Patient D. The Rehab Director/Speech Therapist kept Patient D on caseload the remaining time in order to carry her through the entire 100 day stay. Immediately after patient was placed in the assisted living of Defendants' facility, the same two treating therapist were asked to perform an evaluation for further treatment and therapist declined due poor rehabilitation potential for future gains. Rehab Director then contacted Defendants' home health company to come to River Pointe to continue seeing patient for therapy needs.

129.   **Patient E**, a Part A Medicare beneficiary, was given 720 minute treatment with OT/PT. He was kept for the full 100 days. Therapist were instructed to keep Patient E on caseload for the remainder of days due to facility still needing to finish construction on his adjoining room in the assisted living. Therapist made several attempts to discharge Patient E in

the last several weeks and was told "no" every time. Rehab Director continued to tell therapist to work on upper body strength and range of motion with patient for the remainder of his 100 day stay. Patient E had two rotator tears and would never achieve functional range and compensatory techniques had already been addressed and exercise program had already been established. Patient E's wife died and during funeral arrangements Patient E declined and Rehab Director continued to tell therapist to "bill for at least 15 minutes each time you go into his room and attempt to get him to participate" regardless of patients emotional state and well being.

130.     **Patient F**, a Part A Medicare beneficiary, was provided with 720 minutes with OT/PT. Patient F was admitted due to fall, had dementia, and poor safety awareness. Patient F had reached maximum rehabilitation potential and was no longer being compliant with working towards remaining short-term goals. COTA and OT placed discharge recommendations and again, recommendations were denied from Rehab Director stating, "as long as there is a fall risk, therapy is needed." Patient F had poor compliance with using rolling walker, poor vision, syncope and recommendations for SNF placement or home with 24-hour supervision were routinely made. However, Patient F continued to be treated with arm bike and putty exercises daily.

131.     **Patient G**, a Part B Medicare beneficiary was given both OT and PT. Patient G was admitted from home with pneumonia and progressive weakness due to inactivity and consuming majority of her life with bed rest. Patient G achieved her prior level of function quickly and requested daily that PT and OT leave her alone and that she no longer wished to participate in treatment. Rehab Director was notified routinely of Patient G's request and her quality of life. Request for discharge was denied routinely, stating the family did not want

Patient G to return home and were not ready to tell her.  Finally, PT/OT went above Rehab

Director and just simply wrote their own discharge summaries without permission.  Both PT

and OT were told to evaluate Patient G again shortly after discharge with physician orders

written.  OT and PT asked Patient G if she wished to continue therapy orders and she declined

treatment.  Patient G continued to stay in bed, getting up to toilet and eat only and died a short

time later.

132.    **Patient H**, a Part A Medicare beneficiary, received 720 minutes of all OT, PT

and ST.  Patient H was admitted due to increased confusion and fall at home.  Patient H's

confusion began to subside and he began to frequently complain about his diet stating he

wanted to be on regular solid food and why he wasn't being seen by Rehab Director Tessie.

Patient H would bring himself down to therapy and was very motivated to return home.  Patient

H told his regular treating therapist (PTA/OT) on a daily basis he was not being seen or treated

by speech therapy.  Patient H's agitation grew as his time did at River Pointe and he began to

decline treatment until he was provided with a discharge date.  Recommendations were made to

family/staff/patient and discharge recommendations had been made.  Patient H was held for

further therapy by Rehab Director because a home evaluation could not take place without

family having several more weeks time to install a side rail, which they were notified they

needed initially upon being admitted.  Then, discharge was prolonged due to Patient H's

inability to master a medication management intervention, despite observed safety deficits and

recommendations and knowledge that he would be residing at home with his son with 24-hour

supervision and assistance.

133.    **Patient I**, a Part A Medicare beneficiary received 720 minutes of OT and PT.

Patient I was admitted and Rehab Director was notified that Patient I was only appropriate for a

very short-term stay due to his high functional performance.  Patient I was up and around

facility, was performing majority of his own self-care tasks, and lived at home with his wife

who would be able to assist when needed.  Patient I continued to ask why he was sent to

inpatient therapy settings and was not able to have home health services.  Therapist urged

Patient I to discuss that with Rehab Director or social services.  Rehab Director stated Patient I

was not able to be discharge home until he was able to manage his ostomy bag and after staying

for several more weeks for strengthening.  However, therapist were told not to assist with

educating Patient I on ostomy bag management stating it was a nursing issue and not a therapy

issue.  Patient I told therapist on a daily basis that nursing had not addressed toileting needs

ever so therapist began working with patient daily to assist with preparing for discharge.

Patient I performed 25 min+ of NuStep leg bike and daily free weight, balance activities with

both OT/PT, often times co-treating due repetition of exercises.

134.    **Patient J**, a Part A Medicare beneficiary received 720 minutes of both OT and

PT.  Patient J was admitted due to abdominal surgery causing problems with bladder control.

Therapist had set discharge recommendations due to meeting short-term goals and because

Patient J was ready for discharge home.  Therapist recommended outpatient services with

ProRehab's Eastside location due to them specializing in incontinence training programs. Rehab

Director again stopped discharge adding additional weeks of therapy so that an untrained PTA

could practice a new technique from a book on Myofacial release that he had zero experience

with.  Patient J remained on both OT/PTA schedule until Rehab Director released her home

with therapist setting up outpatient visits for ProRehab as initially planned.

135.    **Patient K**, was a Part B Medicare beneficiary.  While Patient K was living in the

assisted living side of River Pointe.  Rehab Director asked therapist to pick Patient K up for

increased incontinence.  Therapist told Rehab Director she had no experience with incontinence.  Rehab Director handed therapist a A.C.P. book and told her to try her best and the facility wanted to start treating incontinence.  Yet, River Pointe did not even have an A.C.P. electrical stimulation machine to utilize treatment approaches set in place by the book that was provided to therapist.  Therapist again stated she had no experience and did not feel comfortable treating someone with cognitive deficits for incontinence.  Regardless, therapist was told to perform 5-6 exercises the book provided (only a fraction of a true incontinence program) and charge for it.

136.   **Patient L**, a Part A and Part B Medicare beneficiary was a long term resident on the skilled side of River Pointe.  Patient L was a morbidly obese patient who suffered from dementia.  His maximum baseline for assistance was two persons.  However, River Pointe is a "no lift" facility, meaning that the maximum that any worker could lift was 30 pounds.  Any weight over that amount had to be lifted with a hoyer.  OTs were instructed to set unrealistic goals and attempted to justify 720 minutes of therapy by setting unrealistic goals, such as walking and assistance of one person for functional transfers (bed and wheelchair).  Patient L was co-treated approximately 50% of the time by OT and PTA.

137.   **Patient M**, a Part A Medicare beneficiary received 720 minutes of both OT and PT.  Patient M was admitted due to fall.  On the 2nd or 3rd day of treatment, Patient M had a sudden spike of severe pain in hip and continued to ask for medical attention.  Therapist notified Rehab Director of pain onset and requested Patient M's time be dropped or withheld due to inability to tolerate any type of therapy.  Patient M declined therapy one day all together and was still charged.  After x-rays were later taken 1-2 days later, turned out patient had a hip fracture and was admitted into hospital and discharged from River Pointe.

138.    **Patient N**, a Part A Medicare beneficiary received 720 minutes of both OT and PT.  Patient N was admitted due to fall with fracture.  She was initially appropriate and then had a medical decline.  Rehab Director was notified of severe overall decline and severe pain and was asked that her minutes be reduced, as she was not able to tolerate the therapy.  PTA and OT were co-treating patient daily due to patient inability to tolerate two treatment sessions daily.  Patient N was discharged out to hospital due to medical decline and died days later. Patient N was pale, short winded and at times lethargic towards the end of her stay at River Pointe.

139.    "Modalities" generally describe treatments such as heat, cold, and electrical stimulation that are used to produce a tissue response to help reduce pain and inflammation, or to strengthen, relax, or heal muscles.  Modalities are typically used as an adjunct to active therapy to decrease impairments and improve functions.  Some modalities, like heat treatments (*e.g.*, hot packs and infra-red treatments) do not ordinarily require the skills of a qualified therapist unless there is a particular patient complication (*e.g.*, patient has an open wound, fracture, or other complication).  Medicare Benefit Policy Manual 100-2, Ch. 8, §30.4.1.2.

140.    Defendants' therapists regularly recorded time they spent using modalities that were unnecessary and of unreasonable duration as a way to inflate the number of billable therapy minutes and their beneficiaries' RUG levels.

141.    Electrical stimulation is one modality commonly used by Defendants' therapists to inflate the number of minutes reported.

142.    Also, Defendants were using ultrasound as another way of increasing the minutes reported.

143.    For example, **Patient O**, a Part A Medicare beneficiary was a patient at River Pointe two different times.  First admission was for a fall and the second was for a urinary tract

infection.  Upon the first admission, she was in bed twenty-three hours a day and would only get out of bed to use the bathroom and eat.  This was her baseline level of functioning even at home.  Patient O told therapists on a daily basis that she did not want therapy.  Yet, she was at a 500 minutes a week level for skilled therapy.  Upon the second admission, it was the same.  She was able to dress herself and walk into the bathroom and feed herself.  However, she was again put at 500 minutes a week level for skilled therapy.  Patient O continued to refuse therapy and tell therapists she was doing therapy and just wanted to be left alone.  Nevertheless, she was kept as a patient and Medicare was billed for 500 minutes of therapy for approximately a month.  Even though there were no orders for ultra sound or e-stem, OT was instructed by Rehab Director Tessi to use ultrasound and electrical stimulation to get the minutes.  Also, treatment consisted of painting her nails, making her get to the gym and once she refused treatment then getting her back to her room and providing cues for to get dressed.  At times, Patient O was lied to about where her room was so that she would walk in circles looking for her room.  OT and PTA co-treated and billed for the same time.  Such an excessive level of therapy and the use of electrical stimulation and ultrasound were neither skilled nor beneficial to Patient O.

144.    The determination of when a patient was discharged from therapy, which should typically be made by a treating therapist, was often made by Defendants' corporate employees who had little or no knowledge of the patient's condition.  This allowed Defendants to continue billing Medicare for beneficiaries who should have been discharged.

145.    For example, **Patient P** was a Part A Medicare beneficiary.  Patient P was admitted in April 2013 to receive 100 days of therapy.  Patient was at a 720 minute level for skilled therapy.  However, patient was independent with everything after some treatment.

Accordingly, both OT and PT recommended that she be discharged in June of 2013.  Yet, Tessi

would not agree to discharge the patient and instead encouraged OT and PT to continue with the

treatment even though it provided no medical benefit to the patient.  In fact, at this time Relator

Davis wanted to discharge not only this patient about a dozen total in a week's time.  Tessie told

Relator Davis to think outside-the-box and plan discharge better so that the discharges don't

occur at the same time.  Tessie went on to day she was not going to lose her job over this and

that there are just several weeks left to reach the 100 days and that we should just keep providing

720 minutes until the 100 days is exhausted.  Management would also claim that they had not

received the discharge paperwork and require that it be submitted again thereby lengthening the

time for the discharge to be processed.

146.    Furthermore, Defendants also regularly billed for unreasonable and unnecessary

therapy that was provided to Medicare beneficiaries in disciplines that the beneficiaries did not

require.

147.    In practice, Rehab Director ordered therapists in other disciplines (*e.g.*,

occupational therapy and speech language pathology) to "make up" assigned minutes that

another therapist in a different discipline (*e.g.*, physical therapy) refused to provide, for

example, because they believed additional therapy was medically unnecessary or unreasonable.

Rehab Director regularly reassigned "missed minutes" to other therapy disciplines regardless of

patient need in order to attain the number of assigned minutes, particularly during assessment

periods.  This type of "minute management" was critical to the facility's ability to meet

Defendants' Ultra High targets.

148.    To meet the required number of minutes to bill Medicare at the Ultra High level,

Defendants often improperly included time that its therapists spent providing routine or

custodial services that did not require the skills of a rehabilitation therapist and that should have been performed by non-skilled personnel.

149.    For example, Defendants' therapists regularly billed time that the beneficiaries spent working on repetitive exercises that, under the circumstances, did not require skilled care, such as the stationary bike, or time that the therapists spent simply transferring, dressing, toileting, feeding, and bathing beneficiaries rather than training the beneficiaries to perform the activities or exercises themselves.

150.    For example, **Patient Q** was a Part A beneficiary who received 100 days of therapy.  She was a frequent patient at Defendant's facility.  Patient Q was admitted in December of 2012.  She was diagnosed with cellulitis weeping and wound.  Patient Q received 720 minutes of therapy.  Goals were for her to be independent with ADLs.  However, she refused therapy on a daily basis.  OTA and PTA co-treated Patient Q and charged for the same time.  Treatment consisted of talking to her or arguing with her about therapy, watching her eat and getting her dressed.  Patient Q was non-cooperative.  She complained with abdominal pain, bleeding vaginally and had pain with sitting up.  Patient Q said she was dying.  Finally she was taken for evaluation and diagnosed with cancer and died in March or April of 2013.

151.    **Patient R**, also a Part A beneficiary, was admitted on two different occasions. 2nd time admitted in or about February of 2013.  Patient R's admitting diagnosis was dementia and back surgery with pain of 10 out of 10.  She was discharged at the end of April of 2013. Patient R received 500 minutes of therapy.  The goals were to increase safety and be without assist and modified independent with self-care.  Patient was non-compliant with treatment and did not want therapy.  She was already up ad-lib, able to dress, eat and bathe on her own. However, she had poor memory and understanding.  So, treatment consisted of watching her

43

walk.  Co-treated.  OT would paint her fingernails and provide a hot pack.  Tessi pushed for this to continue against OT and PT recommendations.

152.    **Patient S**, a Part A beneficiary was admitted for at least 2-3 times at River Pointe.  Patient S was initially seen for speech therapy during first admission but declined to work with Tessie any further and then was seen by both OT and PT.  The second visit to River Pointe, Patient S refused therapy on a daily basis and was a 500-minute treat a week.  He was non-compliant with working towards any of his therapy goals, received in bed treatment only per patient request.  Tessie was notified daily of Patient S' refusals and his poor motivation/participation and his full physical capabilities of doing much more.  Therapist would typically go in Patient S' room and "talk" and watch him drink coffee.  Patient S demanded to return home with his family or discharge from therapy daily.  Not appropriate for skilled OT service with his poor compliance and participation.  Often co-treated with OT/PT to get minutes.

153.    **Patient T**, a Part B beneficiary, resided in SNF unit at River Pointe.  Patient T received both OT and PT treatment.  Patient T was frequently non-compliant and continued to be on caseload frequently.  Patient T had several episodes of urinary tract infection and pneumonia.  On days of non-compliance, therapist was instructed by Rehab Director to do whatever she wanted to do that day and document it as "therapeutic".  Therapist would help her organize her drawers, closet, and rearrange her furniture to her liking, paint nails, clean jewelry, and pick flowers.  Patient T continued to state that she did not want to use all her Medicare B days early in the year to rehab director.  She continued to tell therapist she did not want to be treated because she understood that if she had another decline in health she would need her therapy and that she believed she was "as good as she was going to get".  Rehab Director told

therapist to disregard patient's complaints and to keep her on caseload until she told therapist

otherwise.  Therapist would frequently charge for a lot time attempting to get her to her therapy

sessions without ever once even treating her.  Patient T was frequently co-treated.

154.    Unskilled interventions were also billed by more than one discipline.  Stationary

bicycles, arm bikes, or leg pedal bikes were used frequently during therapy sessions by both

physical and occupational therapists without any benefit to the patient.

155.    Defendants knew that Medicare only paid for skilled rehabilitative therapy

services that were reasonable and necessary, consistent with the nature and severity of the

patient's illness or injury, the patient's particular medical needs, and accepted standards of

medical practices.

156.    Defendants knew that their push for increased Ultra High billings and longer

average lengths of stay compromised the professional judgment of its rehabilitation therapy

staff and caused them to provide medically unreasonable, unnecessary and unskilled services.

157.    Defendants received numerous complaints from its employees, including Relator

Davis, about the corporate targets and pressure.  Specifically, Relator Davis complained about

Defendants' fraudulent practices.

158.    These complaints alleged, among other things, that therapists provided medically

unnecessary therapy, that supervisors directed employees to increase RUG levels, that

beneficiaries were not discharged until they had exhausted all 100 days of their Medicare Part A

SNF benefit, and that facility supervisors asked the rehabilitation therapy staff to treat people

who did not require skilled therapy.

159.    Yet, Defendants ignored these complaints and retaliated against those who

complained, including Relator Davis.

160.    Numerous therapists resigned due to the constant corporate pressure to provide excessive therapy and their unwillingness to subject Medicare beneficiaries to unnecessary rehabilitation therapy just to increase beneficiaries' RUG levels.

161.    The retaliation against Relator Davis consisted of several adverse employment actions including, but not limited to, termination.

162.    All of this corporate pressure to manipulate RUG levels to maximize Medicare reimbursement regardless of patient care or medical necessity resulted in Defendants very high percentages of patients at the Ultra High RUG level for majority of the Defendants' campuses.

163.    As one can see from the chart, many of Defendants' campuses in 2013 were well above the national average (as published by OIG) of 57% of patients at the Ultra High RUG level.  These high percentages of patients at the Ultra High RUG levels across Defendants' campuses triggered a medical review probe by Wisconsin Physician Services (WPS) on behalf of CMS in October of 2013 and ended on January 13, 2014.  The medical review encompassed four of Defendants' campuses.  Two of the campuses reviewed failed to pass the medical review and resulted in a more targeted medical review (TMR).  In fact, one of the campuses probed was Woodmont Health Campus in Boonville, Indiana and a claim error rate of seventy – five percent (75%) was found.

164.    In addition to the RUG Level manipulation, Defendants also manipulated the ADL scores of patients to maximize Medicare reimbursement.

2.    Manipulation of Patient ADL Scores

165.    ADLs were closely monitored by Amy Miller, Director of Assessment Support, Divisional Assessment Support persons (such as Relator Vinson), Divisional Vice Presidents, such as Rhonda Warner and Executive Directors and MDS Coordinators for each campus.

166.    MDSI was utilized to monitor ADL scores and the financial impact on Medicare Part A reimbursement for each patient and each campus.

167.    MDSI flagged ADL "opportunities".  These "opportunities" were ADL scores that were a point or two away from achieving the next RUG level.  Moreover, the MDSI software detailed how much money was lost by not taking advantage of the opportunities.

168.    The financial analysis portion of the MDSI software that recognized these "opportunities" had no regard for medical necessity or patient well-being.

169.    If a campus was missing opportunities, then Amy Miller, Director of Assessment Support and /or Divisional Vice Presidents would call or email Relator Vinson (if it were her campus) or other similarly situated employees (if concerning a different Assessment Support person's campus) to correct the missed opportunities and to ensure that these opportunities were not captured or flagged by MDSI in the future.

170.    Relator Vinson then would call or email her campus specific MDS coordinator and instruct them to follow-up on the ADL opportunities because it was impacting Medicare reimbursement.

171.    The campus specific MDS coordinator would actually then start visiting the patients on the floor and assisting them with ADLs even if it was not medically necessary.  This practice of the MDS coordinator did it himself/herself because the CNAs felt as though the ADL assistance was not medically necessary because the patients were independent and could

complete the ADLs on their own.  Often times the patients were offended by the assistance

provided by the MDS coordinators.

172.    Examples of emails from Relator Vinson to campus MDS coordinators

concerning ADLs are below.  The first email was in April of 2014 to Chris Hoalt and Susan

Lane (MDS coordinators at Bridge Pointe Health Campus in Vincennes) and the second email

was in December of 2014 to Pamela Cissell (MDS coordinator at St. Charles Health Campus in

Jasper) and Todd Maki (Executive Director at St. Charles Health Campus in Jasper):

> Chris & Susan,
>
> Good morning ☺ I was reviewing MDSI and your Campus flagged
> for an ADL opportunity for the Southwest Division.
>
> On 4/4, **Patient U**'s ADL's were a 5 on her assessment.. Potential
> increase of $81.20 x 30 days = Financial Impact of $2,436 for the
> month. Her ADLs appear to be consistently higher. I did review
> dates after the ARD as well is April 8th she was a 10 & today she is
> a 7.
>
> I encourage you to please follow-up with CRCAs daily esp focus
> on those residents in assessment who are 4's & 5's to be sure they
> are accurately coded. How much support are they providing? Let
> me know if I can assist you any way. I am training new
> Coordinators & we are beginning Matrixcare roll-out but I am
> always here to assist you. If you have any questions I am at the
> Boonville Campus today. Please don't hesitate to call me. Thanks
> for all you do!!!!!!!
>
> Thanks again,
>
> Pam,
>
> I just wanted to tell you think thank you for all you do! You have
> come a long way in 2014. It is difficult to learn MDS without prior
> experience but you have done an exceptional job with your
> position! Sherri will be at the Campus this week on Wednesday &
> next Wednesday to assist with MDS's. Please continue to follow-
> up on CMI and ADLs daily. I have copied a chart from St. Charles
> MDSI for ADL opportunities last month. There are several
> assessments that are only one point away on changing RUG

categories. This difference of $82 per resident per day between an RUA and RUB. I can assist with ADL in-servicing beginning in January if you would like ☺ I would remind your CRCAs to document how much assistance they provide NOT how much they require… toileting adjusting clothing, pulling pants up, zipping pants- extensive assistance. Holding a resident's cup so they can drink – extensive assistance (night shift can do this as they make rounds offering fluids). Adjusting head in bed (lifting pillow) – extensive assistance. Lifting legs in bed – extensive assistance. One suggestion is to do huddles; these are more time effective than scheduling large in-services. This will assist with increasing the MCR rate to meet budget. If there is a particular day you would like me to come, please let me know. I am more than happy to help!!!!

| Resident | Max Days | OBRA | PPS | ARD | Original ADL | Original RUG | Proposed ADL | Proposed RUG | Rate Increases |
|---|---|---|---|---|---|---|---|---|---|
| Patient V | 14 | 1 | 1,0 | 11/14/2014 | 10 | RHB | 11 | RHC | $37.57 |
| Patient W | 30 | 99 | 3,0 | 10/28/2014 | 10 | RVB | 11 | RVC | $57.82 |
| Patient X | 30 | 99 | 3,0 | 11/22/2014 | 10 | RVB | 11 | RVC | $57.82 |
| Patient Y | 10 | 2 | 5,0 | 11/28/2014 | 10 | RUB | 11 | RUC | - |
| Patient Z | 14 | 1 | 1,0 | 10/03/2014 | 5 | RUA | 6 | RUB | $82.39 |
| Patient Z | 30 | 99 | 3,0 | 10/23/2014 | 5 | RUA | 6 | RUB | $82.39 |
| Patient AA | 14 | 99 | 1,1 | 11/26/2014 | 5 | RHA | 6 | RHB | $40.47 |
| Patient AB | 14 | 1 | 1,0 | 12/09/2014 | 10 | RUB | 11 | RUC | - |
| Patient AC | 14 | 1 | 1,0 | 11/17/2014 | 10 | RUB | 11 | RUC | - |
| Patient AD | 16 | 99 | 2,0 | 11/26/2014 | 5 | RUA | 6 | RUB | 82.39 |
| Patient AE | 14 | 1 | 1,0 | 10/01/2014 | 5 | RVA | 6 | RVB | $1.45 |

Thanks again for all you do!!!!!!!

173.    This corporate pressure to fraudulently manipulate ADLs regardless of medical necessity and patient well-being resulted in higher Medicare reimbursement.

174.    Not only did Defendants fraudulently bill Medicare, Defendants also manipulated case mix in order to fraudulently bill Medicaid for higher reimbursement.

### C.    Medicaid Casemix

175.    State Medicaid pays a campus, in part, based upon the average case mix for the campus.  A case mix consists of assessments for each patient completed by MDS coordinators for each campus.

176.    The MDS coordinators use guidelines provided by each State to determine the case mix level for each patient at a campus.  In short, the higher level of care for a patient equates to a higher case mix numerical total for the patient.  The campuses' case mix for each patient are then put into a formula that determines the average case mix for each campus.

177.    Defendants corporate goals were to have as high a patient and corresponding average campus case mix as possible because the higher the average case mix for a campus – the higher the reimbursement by Medicaid.

178.    Again, corporate pressure to increase case mix came from the top.  On October 5, 2015, Amy Miller, Director of Assessment Support, emailed all MDS support including Ashley Vinson, Bethany Lucas, Cahd Showalter, Ginger Kreft, James Jalk, Kimberly Clark, Molly Lovenduski, Bebecca Bruns and Roberta Ochier (that managed and oversaw all campus specific MDS Coordinators) the following email (relevant portions) with a subject line entitled "Case mix":

> Good evening everyone – just wanted to send out a quick email regarding your visit reports. With only 26% of our campuses are state-wide average for case mix, I believe there needs to be more than one line in the report. Reports really need to be detailed, you need to tell what you are doing specifically to assist the campus in the process – are you doing ADL training, going through charts, what opportunities are found and ARDs set, etc. Medicare rates are also being discussed and reviewed. The focus is very much on Assessment Support because of too many "A' RUGs and low CMIs. Your reports are being reviewed carefully. I have attached a couple for great examples from last week. Please feel free to reach out to me if you have any questions or concerns. I know you are all working very hard and I thank you for that ☺ . . .
>
> Amy Miller RN RAC-CT

179.    Each quarter, Carrie VanCuren, Assistant Vice President of Budgeting and Reimbursement, would send an email to Randall Buford, CEO / President, Greg Miller, CFO,

Leigh Ann Barney, COO, Paul Plevyak, Sr. Vice President of Finance, Amy Miller, Director of

Assessment Support, the Divisional Vice Presidents, clinical support and assessment support

that point out any campuses that were below State-wide average for case mix.  She would also

list out who had the most missed "opportunities" and how much revenue was lost for the

quarter.

180.     Below is an example of a quarterly email from Carrie VanCuren (Assistant Vice

President of Budgeting and Reimbursement) dated November 10, 2015:

> In the 3rd Qtr Indiana continues to be the State with the most
> opportunities for improvement with a Trilogy average Medicaid
> CMI of 1.26, .03 lower than the 2nd Qtr and .06 lower than the
> statewide average of 1.32. The Trilogy average of $.68 for each .01
> in Medicaid CMI this would be approximately $.400 per day in
> potential revenues, over $500K for one quarter.
>
> Our Ohio facilities saw a slight increase from the 2nd Qtr to the 3rd
> Qtr! We do still have opportunities as the Ohio Trilogy average
> Medicaid CMI of 2.19 is still .03 lower than the Statewide average
> of 2.22. Currently in Ohio each .01 is equal to about $.41.
>
> The 3rd Qtr Trilogy average Medicaid CMI in Kentucky decreased
> .05 from the 2nd Qtr and is also .05 lower than the Statewide
> average of 1.23.
>
> We are working with our partners to fully understand how the
> changes in CMI scores for Ohio and Indiana will affect our rates,
> but at this time they are not estimating a large impact for Trilogy
> as a whole for Indiana Medicaid rates beginning in 07/01/16 and
> Ohio looks to be a pickup for most of the Trilogy facilities.
> Colerain is one Trilogy facility that looks to be taking a material
> hit to their Medicaid rate in July 2016. We will keep you update as
> new information becomes available.
>
> If there is anyone that I have inadvertently left off of this email,
> please let me know so I can add them to the list of recipients.
>
> Please do not hesitate to contact Amy Miller or myself if you have
> any question regarding this report.
>
> Carrie L. VanCuren

Trilogy Health Services, LLC.
Assistant Vice President – Budgeting & Reimbursement

181.     These quarterly emails had no regard for medical necessity or patient well-being. Further, these emails triggered pressure from Randall Buford, CEO / President to Amy Miller, Director of Assessment Support, who in turn pressured Assessment Support including Relator Vinson.  The message was that every campuses' case mix had to be at least at State average every quarter – no exceptions.

182.     If the case-mix opportunities were not corrected, it could mean adverse employment actions up to and including termination.  Consider the following email from Amy Miller, Director of Assessment Support, dated September 15, 2015 to all Assessment Support including Ashley Vinson, Bethany Lucas, Chad Showalter, James Jalk, Kimberly Clark, Molly Lovernduski, Rebecca Bruns and Roberta Ochier:

> Sorry for another email, but can you send me an explanation, if you have a campus with a high number as to why and when it will be resolved? Also, spoke with Margie this morning after her ketchup meeting with Randy and Leigh Ann. They were commenting on the fact that there has been no movement in case mix. I know everyone has been pulled in too many directions, but we need to be looking at the low CMI folks and following what is going on. *Maybe even look for new folks* if we have been over it with them again and again . . . (emphasis added).

183.     The Divisional Vice Presidents also pressured Assessment Support concerning case mix.

184.     All of this corporate pressure to maximize case mix led to the Defendants implementing a scheme to defraud Medicaid by using "wrap-arounds" to capture a higher case mix.

1.     <u>Wrap-Arounds</u>

185.    In order to capture therapy for a patient on a MDS assessment for a higher case mix, a patient must receive five (5) days of therapy (and in some States also 150 minutes of therapy) in a seven (7) period.

186.    Accordingly, Defendants used wrap-arounds to manipulate patients' scheduled therapy to capture five (5) days within a seven (7) period.

187.    In other words, if a particular patient's doctor orders specified the patient was to only receive three sessions of therapy per week, then Defendants would purposefully manipulate the scheduling of the patient's three (3) therapy sessions to cluster around the weekend of W1 and then cluster the following week's sessions (W2) to cluster around the same weekend so as to capture the five (5) days of therapy within seven (7) days to bill Medicaid for higher reimbursement.

188.    So, based upon the fraudulent wrap-around assessment, Medicare and/or Medicaid was being billed as though the patients were receiving five (5) days of therapy per week, when in realty and per the doctor's orders, patients were receiving only three (3) days of therapy per week.

189.    The below charts illustrate this fraudulent manipulate of the scheduling of the therapy (wrap-arounds):

| Saturday | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  | **E** |
| Saturday | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday |
|  |  |  |  | **X** | **X** | **X** |

| Saturday | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|---|
|  |  | **X** | **X and A** |  |  |  |

or

| Saturday | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|---|
|  |  |  |  |  | **X** | **X** |

| Saturday | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|---|
|  |  | **X** | **X** | **X and A** |  |  |

**E** = evaluation

**X** = therapy scheduled; and

**A** = assessment

190.   This scheme to use wrap-arounds did not take into account patient well-being and in fact, negatively impacted patient care and outcomes.

191.   Indeed, by using the wrap-arounds, patients went longer periods of time without any therapy just so Defendants could increase the case mix for the patient and make more money.

192.   The wrap-around scheme was taught by Amy Miller, Director of Assessment Support, in MDS Academy that takes place in central locations that are attended by all campuses.  Amy Miller teaches this scheme to Executive Directors, Director of Health Services and MDS coordinators for all campuses.

193.   The wrap-around scheme was also taught during clinical meetings from the clinical care meeting manual.  This slide is identical or similar to slides used in various training manuals used throughout the Defendants business locations.  Below is an excerpt from the clinical care meeting manual:

<u>CMI Considerations</u>

**Therapy services**

- Provide schedules to IDT 4 weeks in advance – keep team informed of changes
- Ensure therapy screens are completed at least quarterly.
- Communicate daily with Program Director – discuss who is on Part B, how can a RAx be captured?
- Ensure therapy ordered for 3 days a week is delivered in a "wrap around" manner for the reference period (ie: Wed, Thurs, Fri, Mon, Tues) to capture 5/7 days.
- The ARD should be a team discussion and then communicate to all team members
- Remember we are looking for RUG III for Medicaid and all therapy minutes count

194.    Upon hire, Assessment Support, including Relator Vinson, was likewise trained to implement wrap-arounds by Amy Miller.

195.    The training is also in the form PowerPoint presentations that are State specific.

196.    The manipulation of scheduling of therapy (wrap-arounds) occurred at campuses in Indiana, Kentucky and Ohio as evidenced by the examples below.

*Examples for Indiana Campuses*

197.    **Patient AF** was a patient of Greenleaf Health Campus (Elkhart).  Patient AF was a seventy – seven (77) year old female referred to therapy for swallowing difficulties during meals and med pass for several days.  She had a history of dysphagia.  Per speech therapist, the patient was at risk of aspiration, pneumonia and up to death without therapy.  Her physician order for treatment was three (3) days of speech therapy per week for thirty (30) days.  Yet, per the corporate scheme to use wrap-arounds to manipulate scheduled therapy, this patient had her therapy clustered to ensure five days of therapy in a seven (7) day period.  As such, Patient AF was then forced to wait a period of five days before having more therapy because a wrap-around manipulation had been done to capture a therapy RUG in her case mix.  Specifically, she received therapy in 2015 on August 6, August 7, August 10, August 11 and

August 12.  Her MDS assessment was conducted on August 12 to capture this wrap-around and
her RUG was scored as an RAC.  Patient AF then had to wait until August 17 for her next day
of therapy.

| Aug. 6 | Aug. 7 | Aug. 8 | Aug. 9 | Aug. 10 | Aug. 11 | Aug. 12 | Aug. 13 | Aug. 14 | Aug. 15 | Aug. 16 | Aug. 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X | X | | | X | X | X | | | | | X |

198.  **Patient AG** was a patient of Greenleaf Health Campus (Elkhart).  Patient AG
was a eighty – three  (83) year old male who presented to therapy with a decline in ADLs and
transfers due to weakness and debility.  Nursing observed a decrease in self-care and ADL
ability for a few weeks resulting in decrease safety and increased need for assistance.  Without
therapy, this patient was at risk for falls and further significant decline.  His physician order for
treatment was physical therapy three times per week for ninety (90) days.  Yet, per the
corporate scheme to use wrap-arounds to manipulate scheduled therapy, this patient had his
therapy interrupted in order to cluster the therapy around a weekend so as to ensure five days of
therapy in a seven (7) day period.  As such, Patient AG was then forced to wait a period of five
days before having more therapy because a wrap-around manipulation had been done to capture
a therapy RUG in his case mix.  Specifically, he received therapy in 2015 on September 11,
then had to wait until September 16 before he could have therapy again (the start of the wrap-
around).  His MDS assessment was conducted on September 22 to capture this wrap-around and
his RUG was scored as an RAD.

| Sept. 11 | Sept. 12 | Sept. 13 | Sept. 14 | Sept. 15 | Sept. 16 | Sept. 17 | Sept. 18 | Sept. 19 | Sept. 20 | Sept. 21 | Sept. 22 | Sept. 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X | | | | | X | X | X | | | X | X | |

199.  **Patient AH** was a patient of St. Andrews Health Campus (Batesville).  Patient
AH was an eighty – five  (85) year old female who was evaluated by physical therapy for

difficulty walking, transferring to wheelchair and pain in her bilateral knees upon weight bearing.  Physical therapy was necessary to improve transfers and gait.  Without therapy, she was at risk for falls and deconditioning.   Her physician order for treatment was physical therapy three times per week for thirty (30) days.  Yet, per the corporate scheme to use wrap-arounds to manipulate scheduled therapy, this patient had therapy withheld for six (6) days to accommodate the wrap-around.  Accordingly, Patient AH received therapy in 2015 on June 12 and then did not received therapy again until June 18 (the start of the wrap-around).  Her MDS assessment was conducted on June 24 to capture this wrap-around and her RUG was scored as an RAC.

| June 12 | June 13 | June 14 | June 15 | June 16 | June 17 | June 18 | June 19 | June 20 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| X       |         |         |         |         |         | X       | X       |         |
| June 21 | June 22 | June 23 | June 24 | June 25 | June 26 | June 27 | June 28 | June 29 |
|         | X       | X       | X       |         |         |         |         | X       |

200.    **Patient AI** was a patient of St. Andrews Health Campus (Batesville).  Patient AI was a ninety – three (93) year old female who presented to occupational therapy for a decline in ADLs of bathing, toileting and functional transfers due to muscle weakness and cognitive status.  She required therapy to improve safety and function.   Her physician order for treatment was physical therapy three times per week for sixty (60) days.  Yet, per the corporate scheme to use wrap-arounds to manipulate scheduled therapy, she waited six days for therapy following her wrap-around.  Accordingly, Patient AI received therapy in 2015 on September 10, September 11, September 14, September 15 and September 16 and then did not receive therapy again until September 22.  Her MDS assessment was conducted on June 16 to capture this

wrap-around and her RUG was scored as an RAD.

| Sept. 9 | Sept. 10 | Sept. 11 | Sept. 12 | Sept. 13 | Sept. 14 | Sept. 15 | Sept. 16 | Sept. 17 | Sept. 18 | Sept. 19 | Sept. 20 | Sept. 21 | Sept. 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | X | X |  |  | X | X | X |  |  |  |  |  | X |

### *Examples for Kentucky Campuses*

201.    **Patient AJ** was a patient of Cedar Ridge Health Campus (Cythiana).  Patient AJ

was a eighty - eight (88) year old female who had presented to physical therapy with a decline

in ADLs and ambulation resulting in decrease safety and increased need for assistance.

Without physical therapy, she was risk for increased functional decline. Her physician order for

treatment was physical therapy three times per week for four (4) weeks.  Yet, per the corporate

scheme a wrap-around was used to manipulate her scheduled therapy in order to capture five

(5) days of therapy in a seven (7) day period.  Accordingly, Patient AJ received therapy in 2015

on April 23, April 24, April 27, April 28 and April 29. Her MDS assessment was conducted on

April 29 to capture this wrap-around and her RUG was scored as an RAC.

| April 21 | April 22 | April 23 | April 24 | April 25 | April 26 | April 27 | April 28 | April 29 | April 30 |
|---|---|---|---|---|---|---|---|---|---|
|  |  | X | X |  |  | X | X | X |  |

202.    **Patient AK** was a patient of Cedar Ridge Health Campus (Cythiana).  Patient

AK was a eighty - one (81) year old male who had presented to physical therapy with a decline

in gait with a fall during ambulation in the last week.  He had a decline in safety with walking.

Without physical therapy, he was risk for increased functional decline and increased risk for

falls.  His physician order for treatment was physical therapy three times per week for four (4)

weeks.  Yet, per the corporate scheme a wrap-around was used to manipulate his scheduled

therapy in order to capture five (5) days of therapy in a seven (7) day period.  Accordingly,

Patient AK received therapy in 2015 on June 18, June 19, June 22, June 23 and June 24.  He

then had to wait six (6) days for therapy to begin again.  His MDS assessment was conducted

on June 24 to capture this wrap-around and his RUG was scored as an RAB.

| June 18 | June 19 | June 20 | June 21 | June 22 | June 23 | June 24 | June 25 | June 26 | June 27 | June 28 | June 29 | June 30 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| X | X |  |  | X | X | X |  |  |  |  |  | X |

203.    **Patient AL** was a patient of the Willows at Hamburg Campus (Lexington).

Patient AL was a ninety – six (96) year old male who had presented to occupational therapy

with a functional decline in self care.  He had a decreased activity tolerance and increased risk

of falls.  Without physical therapy, he had a risk for further decline, falls and weakness.  His

physician order for treatment was occupational therapy three times per week for seven (7)

weeks.  Yet, per the corporate scheme a wrap-around was used to manipulate his scheduled

therapy in order to capture five (5) days of therapy in a seven (7) day period.  Accordingly,

Patient AL received therapy in 2015 on January 23, but did not receive therapy again until

January 28 – the first day of the wrap-around.  The therapy provided to capture the wrap-around

occurred on January 28, January 29, January 30, February 2 and February 3.  His MDS

assessment was conducted on February 3 to capture this wrap-around and his RUG was scored

as an RAA.

| Jan. 23 | Jan. 24 | Jan. 25 | Jan. 26 | Jan. 27 | Jan. 28 | Jan. 29 | Jan. 30 | Jan. 31 | Feb. 1 | Feb. 2 | Feb. 3 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|--------|--------|--------|
| X |  |  |  |  | X | X | X |  |  | X | X |

204.    **Patient AM** was a patient of the The Willows at Hamburg Campus (Lexington).

Patient AM was a ninety – seven (97) year old female who was referred to physical therapy

related to staff complaints of maximum assistance with transfers that are not safe. Without

physical therapy, the patient was at risk further decline.  Her physician ordered therapy three

times per week.  Yet, per the corporate scheme a wrap-around was used to manipulate his scheduled therapy in order to capture five (5) days of therapy in a seven (7) day period. Accordingly, Patient AM received therapy in 2015 on March 12, March 13, March 16, March 17 and March 18, but did not receive therapy again until March 23.  Her MDS assessment was conducted on March 18 to capture this wrap-around and her RUG was scored as an RAC.

| March 12 | March 13 | March 14 | March 15 | March 16 | March 17 | March 18 | March 19 | March 20 | March 21 | March 22 | March 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X | X |  |  | X | X | X |  |  |  |  | X |

*Examples for Ohio Campuses*

205.  **Patient AN** was a patient of The Meadows of Kalida Campus (Kalida).  Patient AN presented to speech therapy due to increased coughing during meals and with liquids.  He had no prior history of dysphagia (swallowing). Without therapy, he was at risk for aspiration, aspiration pneumonia, malnutrition and dehydration.  His physician order for treatment was speech therapy three times per week for thirty (30) days.  Yet, per the corporate scheme a wrap-around was used to manipulate his scheduled therapy in order to capture five (5) days of therapy in a seven (7) day period.  Accordingly, Patient AN received therapy in 2015 on July 16, July 17, July 20, July 21 and July 22.  After this wrap-around, he then had to wait five (5) days for next speech therapy session.  His MDS assessment was conducted on July 22 to capture this wrap-around and his RUG was scored as an RAB.

| July 15 | July 16 | July 17 | July 18 | July 19 | July 20 | July 21 | July 22 | July 23 | July 24 | July 25 | July 26 | July 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | X | X |  |  | X | X | X |  |  |  |  | X |

206.  **Patient AO** was a patient of The Meadows of Kalida Campus (Kalida).  Patient AO was referred to speech therapy following a choking incident in the dining room.  Without therapy, she was at risk for aspiration, aspiration pneumonia, malnutrition and dehydration.

Her physician order for treatment was speech therapy three times per week for thirty (30) days. Yet, per the corporate scheme a wrap-around was used to manipulate his scheduled therapy in order to capture five (5) days of therapy in a seven (7) day period.  Accordingly, Patient AO received therapy in 2015 on August 20, August 21, August 24, August 25 and August 26.  After this wrap-around, she then had to wait five (5) days for next speech therapy session.  Her MDS assessment was conducted on August 26 to capture this wrap-around and her RUG was scored as an RAC.

| Aug. 18 | Aug. 19 | Aug. 20 | Aug. 21 | Aug. 22 | Aug. 23 | Aug. 24 | Aug. 25 | Aug. 26 | Aug. 27 | Aug. 28 | Aug. 29 | Aug. 30 | Aug. 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | X | X |  |  | X | X | X |  |  |  |  | X |

207.   **Patient AP** was a patient of Village Green Health Campus (Greenville).  Patient AP was seventy (70) year old male who was referred to physical therapy due to a decline in ADLs and functional mobility.  He required skilled therapy in order to improve safety and function.  His physician order was for physical therapy three times per week for four (4) weeks. Yet, per the corporate scheme a wrap-around was used to manipulate his scheduled therapy in order to capture five (5) days of therapy in a seven (7) day period.  Accordingly, Patient AP received therapy in 2015 on January 13, January 14, January 15, January 19 and January 20. After this wrap-around, he then had to wait seven (7) days for physical therapy to start again. His MDS assessment was conducted on January 20 to capture this wrap-around and his RUG was scored as an RAB.

| Jan. 13 | Jan. 14 | Jan. 15 | Jan. 16 | Jan. 17 | Jan. 18 | Jan. 19 | Jan. 20 |
|---|---|---|---|---|---|---|---|
| X | X | X | | | | X | X |

| Jan. 21 | Jan. 22 | Jan. 23 | Jan. 24 | Jan. 25 | Jan. 26 | Jan. 27 | Jan. 28 |
|---|---|---|---|---|---|---|---|
| | | | | | | X | |

208.    **Patient AQ** was a patient of Village Green Health Campus (Greenville).  Patient AQ was a eighty – seven (87) year old female who presented to physical therapy with a decline in ADLs of transfers and ambulation.  She required skilled therapy in order to improve safety and function.  Her physician order was for physical therapy three times per week for thirty (30) days.  Yet, per the corporate scheme a wrap-around was used to manipulate his scheduled therapy in order to capture five (5) days of therapy in a seven (7) day period.  Accordingly, Patient AQ received therapy in 2015 on March 5, March 6, March 9, March 10 and March 11.  After this wrap-around, she then had to wait five (5) days for her next physical therapy appointment.  Her MDS assessment was conducted on March 11 to capture this wrap-around and her RUG was scored as an RAB.

| March 5 | March 6 | March 7 | March 8 | March 9 | March 10 | March 11 | March 12 | March 13 | March 14 | March 15 | March 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X | X | | | X | X | X | | | | | X |

209.    These examples of the wrap-around scheme show that the fraud is not isolated, but rather systemic throughout Defendants' campuses in Indiana, Kentucky and Ohio.  Moreover, this scheme has been in place for at least four years.  Relator Vinson began employment in 2012 and this scheme was in place prior to her beginning her employment with Defendants.

210.    Not only did Defendants pressure and punish employees that failed to follow the manipulation of case mix, but Defendants also offered rewards to employees if the case mix targets were achieved.  Consider the following email from Amy Miller, Director of Assessment Support, to all Assessment Support and MDS Coordinators:

> Hello MDS Nurses and Coordinators: I wanted to take a little time to tell you all where we are in our journey as an organization with our 4TA Approach. I pulled out numbers from 1st Quarter 2011, which were the numbers used when Trilogy first began to focus on case mix. For this particular quarter, we had 4 campuses that were at or above the state-wide average. With all states not reporting their 1st (or only☺) preliminary numbers for 3rd quarter 2012, I am proud to say that we had 37 campuses with increases to their case mix, 3 campuses above the state-wide averages with 3rd  Q being their first Medicaid reporting, 29 campuses above the state-wide average, and 14 so close they can taste it I'm sure. Of the eligible campuses, as a company we currently have 48% of our campuses at or above the state-wide average. If we could get those 14 over the top, our percentage would increase to 71%. As a company, we have set our goal at 95% of our campuses to be at or above the state average for case-mix, so you can see we have some work to do. Because of the work you do, we can provide Live a Dream for our residents, Southwest retreats to Ferdinand, ER3's for our staff, and gas bonuses. Just think if we could hit the pillar goal of 95% the great things that could be done! Trilogy (and myself!) are very blessed to have each one of you on the Trilogy MDS team. Even though I am guilty of not telling you often enough, I want you all to know that your work is very much appreciated and what you do and how you do it matters for your campus. I thank you from the bottom of my heart for all of the progress we have made as a team and look forward to working with you as we climb to the top and reach our goal. Thank-you all for everything you do ☺
>
> Amy Miller RN

IV.

CAUSES OF ACTION

**First Claim**
(Violation of 31 U.S.C. § 3729(a)(1)(A))

211.    The Relators repeat and incorporate herein by reference the material allegations

of paragraphs 1 - 210 above.

212.    Defendants presented, or caused to be presented, with the United States

Government false or fraudulent claims for payment or approval in the form of billing, billing

forms and other documents with knowledge of their falsity, or with reckless and deliberate

disregard to facts and conditions that would indicate, that said claims were inaccurate or

inappropriate and false and caused payments for said claims to be made by the United States

Government, specifically, claims for payment for medically unreasonable, unnecessary and

unskilled rehabilitation therapy.

213.    By submitting the billing, billing forms and other documents to the United

States Government for payment of monies, Defendants implicitly represented to the United

States Government compliance with requirements for Government payment of said monies.

214.    By reason of the violation of 31 U.S.C. §3729(a)(1)(A), Defendants knowingly

or recklessly damaged the United States Government in as yet undetermined amount.

**Second Claim**
(Violation of 31 U.S.C. 3729(a)(1)(B))

215.    The Relators repeat and incorporate herein by reference the material allegations

of paragraphs 1 - 210 above.

216.    Defendants made, used or caused to be made or used, false records or statements

to get false or fraudulent claims paid or approved by the United States Government.

217.    By reason of the violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly

or recklessly damaged the United States Government in an as yet undetermined amount.

**Third Claim**
(Violation of 31 U.S.C. § 3729(a)(1)(C))

218.    The Relators repeat and incorporate herein by reference the material allegations

of paragraphs 1 - 210 above.

219.    This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. §§ 3729 *et seq.*, as amended.

220.    By virtue of the acts described above, Defendants have conspired to knowingly

present or cause to be presented, false or fraudulent claims to the United States Government for

payment or approval, or have conspired to make, use, or cause to be made or used, a false

record or statement material to false or fraudulent claims.

221.    Defendants have formed an agreement to submit each false claim.

222.    Defendants have committed an act in furtherance of the object of this

agreement.

223.    Each Defendant has acted with the intent to defraud.

224.    The United States Government, unaware of the falsity of the records, statements

and claims made, used, presented or caused to be made, used or presented by Defendants, paid

and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

225.    As a proximate result of Defendants' actions as set forth above, the United

States Government has been, and may continue to be, severely damaged, in a substantial

amount to be determined at trial.

226.    Additionally, the United States is entitled to the maximum penalty of up to

$11,000 for each and every violation alleged herein.

**Fourth Claim**
(Violation of I.C. § 5-11-5.5-2(b)(1))

227.   The Relators repeat and incorporate herein by reference the material allegations of paragraphs 1 - 210 above.

228.   Defendants presented or caused to be presented false claims for payment or approval to Indiana Medicaid and the State of Indiana with the intent to defraud the State and cause Medicaid to make payment for services, when the Defendants had no right to receive payment for the services, specifically, claims for payment for medically unreasonable, unnecessary and unskilled rehabilitation therapy.

229.   By reason of Defendants' violation of the violations of I.C. § 5-11-5.5-2(b)(1), Indiana Medicaid and the State of Indiana have been damaged in an as yet undetermined amount.

**Fifth Claim**
(Violation of I.C. § 5-11-5.5-2(b)(2))

230.   The Relators repeat and incorporate herein by reference the material allegations of paragraphs 1 - 210 above.

231.   This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5 *et seq.*, as amended.

232.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

233.   By reason of Defendants' violation of the violations of I.C. § 5-11-5.5-2(b)(2), Indiana Medicaid and the State of Indiana have been damaged in an as yet undetermined amount.

## Sixth Claim
(Violation of I.C. § 5-11-5.5-2(b)(7))

234.    The Relators repeat and incorporate herein by reference the material allegations of paragraphs 1 - 210 above.

235.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act, I.C. §§ 5-11-5.5 *et seq.*, as amended.

236.    By virtue of the acts described above, Defendants knowingly conspired to present or cause to be presented, false or fraudulent claims to the Indiana State Government for payment or approval, or conspired to make, use, or cause to be made or used false records and statements to obtain payment or approval of false claim from the Indiana State Government.

237.    Defendants have formed an agreement to submit each false claim.

238.    Defendants have committed an act in furtherance of the object of this agreement.

239.    Each Defendant has acted with the intent to defraud.

240.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

241.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

242.    Additionally, the Indiana State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## **Seventh Claim**
(Violation of 31 U.S.C. § 3730(h))

243.    The Relator Davis repeats and incorporates herein by reference the material allegations of paragraphs 1 - 210 above.

244.    Relator Davis engaged in lawful conduct in the furtherance of an action under § 3730.

245.    Relator Davis was discharged or otherwise discriminated against in the terms or conditions of her employment by Defendants.

246.    Defendants' discriminatory actions and conduct were motivated by Relator's conduct in furtherance of the § 3730 action.

247.    By reason of Defendants' violation of 31 U.S.C. § 3730(h), Relator Davis has been damaged in an as yet undetermined amount.

## **Eighth Claim**
(Violation of I.C. §5-11-5.5-8)

248.    The Relator Davis repeats and incorporates herein by reference the material allegations of paragraphs 1 - 210 above.

249.    Relator Davis engaged in lawful conduct by objecting to the Defendants submitting the false claims to the State and Medicaid for payment.

250.    Relator Davis was discharged or otherwise discriminated against in the terms or conditions of her employment by Defendants.

251.    Defendants' discriminatory actions and conduct were motivated by Relator's conduct in opposition to Hospital's violation of I.C. §5-11-5.5-2.

252.    By reason of Defendants' violation of I.C. §5-11-5.5-8, Relator Davis has been damaged in an as yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, United States of America and the State of Indiana *ex. rel.* Ashley N. Vinson, Amanda E. Davis and Amanda E. Davis individually, pray that judgment be entered against the Defendants, as follows:

A.      Interest;

B.      That this Court order Defendants to cease and desist from violating 31 U.S.C. §§ 3729 *et seq.*, and Ind. Code §§ 5-11-5.5 *et seq.*;

C.      Judgment against Defendants in the amount equal to three (3) times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §§ 3729 *et seq.*;

D.      Judgment against Defendants in an amount equal to three (3) times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of Ind. Code §§ 5-11-5.5 *et seq.*;

E.      That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and Ind. Code § 5-11-5.5-6 of the Indiana False Claims and Whistleblower Protection Act;

F.      As a result of Defendants' violations of 31 U.S.C. § 3730(h) and I.C. §5-11-5.5-8, all relief necessary to make Relator Davis whole, including without limitation, reinstatement with the same seniority status Relator Davis would have had but for Defendants' violations, not less than two times the amount of back pay, interest on the back pay, compensatory damages for Relator's emotional distress and suffering and attorney fees and costs; and

G.      That Relators be awarded all costs of this action, including Relators' attorney fees and expenses, and such other relief as this Court deems just and proper.

H.      In addition, Plaintiffs pray for such further and additional relief at law or in equity that this Court may deem appropriate or proper.

Respectfully Submitted,


*s/Lane C. Siesky*
Lane C. Siesky, Atty. No. 21094-53
Karolina Viehe, Atty. No. 30894-82
SIESKY & VIEHE, PC
4424 Vogel Rd., Suite 305
Evansville, Indiana 47715
Telephone: (812) 402-7700
Fax:  (812) 402-7744
lane@sieskylaw.com
karolina@sieskylaw.com
ATTORNEYS FOR PLAINTIFFS-RELATORS



## DEMAND FOR JURY TRIAL

Plaintiff, United States of America and the State of Indiana *ex. rel*. Ashley N. Vinson, Amanda E. Davis and Amanda E. Davis individually, hereby demand a jury trial on all counts of this amended complaint.


*s/Lane C. Siesky*
Lane C. Siesky, Atty. No. 21094-53
Karolina Viehe, Atty. No. 30894-82
SIESKY & VIEHE, PC
4424 Vogel Rd., Suite 305
Evansville, Indiana 47715
Telephone: (812) 402-7700
Fax:  (812) 402-7744
lane@sieskylaw.com
karolina@sieskylaw.com
ATTORNEYS FOR PLAINTIFFS-RELATORS

## CERTIFICATE OF SERVICE

I certify that on January 25, 2016, a copy of the foregoing pleading was filed

electronically using the CM/ECF system, which will send notification of such filing to the

following:

> Steve Hunt, Esq.
> Supervising Deputy Attorney General
> Medicaid Fraud Control Unit
> 8005 Castleway Drive
> Indianapolis, IN 46250
> Telephone:  (317) 915-5320
> Facsimile:  (317) 232-6523
> shunt@atg.state.in.us
>
> Shelese Woods, Esq.
> United States Attorney's Office
> 10 W. Market, Suite 2100
> Indianapolis, IN 46204
> Telephone:  (317) 226-6333
> Facsimile:  (317) 226-5027
> Shelese.woods@usdoj.gov

*s/ Lane C. Siesky*
Lane C. Siesky